# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LAMONT MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-3289 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, WESTERN ILLINOIS | ) | |
| CORRECTIONAL CENTER, OFFICER | ) | |
| JASON GATEWOOD, in his personal and | ) | |
| official capacities and UNKNOWN | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS OFFICERS | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COMES, Plaintiff, by and through his attorneys, The Walters Law Firm, and responds in opposition to the Defendant's Motion for Summary Judgment.

## I.     INTRODUCTION

This is not a summary judgment case. In their Motion asking for summary judgment, Defendants are trying to ignore the elephant in the room -- Lamont Moore's unequivocal and multiple accounts of how he repeatedly warned Defendant Gatewood that a physical altercation between him and another inmate, Keleel Sample, was inevitable.

Moore asked to be moved for days before the attack. He informed Gatewood of the confrontations he was having with Inmate Sample throughout the day of the attack. Moore further documented the warnings he gave to Gatewood in his various grievances. Additionally,

Moore has witnesses to substantiate his claims. Unfortunately, Gatewood ignored these warnings, and betrayed the duty he had to keep Moore safe from a foreseeable attack.

Moore's accounts of what truly occurred on June 14, 2015 control for purposes of summary judgment. Though Gatewood denies that he had any knowledge of trouble brewing in the dorm to which he was assigned, there is a plethora of evidence to rebut this.

This evidence alone is dispositive of the issue of whether Defendant Gatewood had knowledge of the impending danger posed to Mr. Moore, and whether he violated Plaintiff's right to be free from cruel and unusual punishment by failing to act on the various warnings he received; but there is also other documentary and circumstantial evidence in the case all supporting the same findings.

For these reasons, and many others explained below, Defendants' Motion for summary judgment must be denied.

## II.   RESPONSE TO UNDISPUTED MATERIAL FACTS

### A.  Undisputed Material Facts

1. Plaintiff concedes that in June 2015, Plaintiff was an inmate incarcerated at Vandalia Correctional Center and housed in J dorm. (Def. Mo. Summ. J. UMF 1)

2. Plaintiff concedes that Plaintiff and another inmate named Kaleel Sample lived in the same dorm. (Def. Mo. Summ. J. UMF 2)

3. Plaintiff concedes that in June 2015, Defendant Gatewood was the regular dorm officer in the upper part of J Dorm at Vandalia Correctional Center. (Def. Mo. Summ. J. UMF 3)

2

4. Plaintiff concedes that in June 2015, Defendant Gatewood regularly worked the 7:00 a.m. to 3:00 p.m. shift (Def. Mo. Summ. J. UMF 4).

5. Plaintiff concedes that Gatewood would have been the only officer assigned to the upper deck of J Dorm during his shift (Def. Mo. Summ. J. UMF 5).

6. Plaintiff concedes that J Dorm was an open dorm setting, open like a large pole barn. There were approximately 40-44 bunk beds lined up in rows, and there was a shower room in the back and restroom. (Def. Mo. Summ. J. UMF 6).

7. Plaintiff concedes that there may have been around 86 inmates housed in J Dorm in June 2015. (Def. Mo. Summ. J. UMF 7)

8. Plaintiff concedes that inmates kept their property in lockboxes under their bunks. There were padlocks welded to the bunks that allowed inmates to lock up their stuff. (Def. Mo. Summ. J. UMF 8)

9. Plaintiff concedes that about four days before the assault, Plaintiff and inmate Sample had an incident where Sample splashed water in the bathroom, and Plaintiff told him to stop. (Def. Mo. Summ. J. UMF 9).

10. Plaintiff concedes that Plaintiff testified that the next interaction with Sample occurred on the day of the assault. Plaintiff further concedes that on the day of the assault, Plaintiff was going to lunch

and Sample said something to him that Plaintiff brushed off. (Def.
Mo. Summ. J. UMF 11)

11. Plaintiff concedes that Plaintiff had requested that the correctional
officer move him away from "young guys" who were placed near
him. (Def. Mo. Summ. J. UMF 12)

12. Plaintiff concedes that after Plaintiff went to lunch on June 14, he
went back to the dorm and sat on his bunk. Plaintiff further
concedes he testified that he then went to talk to Defendant
Gatewood and asked him again to move him away from those
guys. (Def. Mo. Summ. J. UMF 13)

13. Plaintiff concedes that Plaintiff testified that Defendant Gatewood
told Plaintiff that he had spoken with the lieutenant about his
request to be moved to a different side of the dorm. (Def. Mo.
Summ. J. UMF 14)

14. Plaintiff concedes that later, inmate Sample came to Plaintiff's area
with other inmates he was "tussling" with, and Plaintiff asked him
to go somewhere else to engage in horse play. (Def. Mo. Summ. J.
UMF 15)

15. Plaintiff concedes that he testified that Sample seemed upset that
Plaintiff had asked him to stop horsing around. According to
Plaintiff, Sample said a few more words that Plaintiff just brushed

off. Plaintiff does not remember what Sample said. (Def. Mo. Summ. J. UMF 16)

16. Plaintiff concedes that he testified that he was not afraid of inmate Sample. (Def. Mo. Summ. J. UMF 17)

17. Plaintiff concedes that Plaintiff testified he did not expect inmate Sample to hit him. (Def. Mo. Summ. J. UMF 18)

18. Plaintiff concedes that he testified that he did not think inmate Sample was going to attack him. (Def. Mo. Summ. J. UMF 19)

19. Plaintiff concedes Inmate Sample hit Plaintiff one time in the left eye and stabbed him with a key he held between his fingers. (Def. Mo. Summ. J. UMF 20)

20. Plaintiff concedes that the medical staff sent Plaintiff to the outside hospital on June 14. (Def. Mo. Summ. J. UMF 22)

21. Plaintiff concedes when Plaintiff returned to Vandalia Correctional Center from the hospital, he stayed in the health care unit the entire time until his transfer to Western Illinois Correctional Center (Def. Mo. Summ. J. UMF 23).

22. Plaintiff concedes that Defendant Gatewood wrote an incident report (Def. Mo. Summ. J. UMF 27).

23. Plaintiff concedes he testified that he wanted to stay in the health care unit—he did not want to return to general population—and he

claims that he asked an officer and a member of the medical staff if he could stay in the health care unit (Def. Mo. Summ. J. UMF 31).

24. Plaintiff concedes that his left eye was removed in 2015 (Def. Mo. Summ. J. UMF 32).

25. Plaintiff concedes that after the surgery to remove his left eye, Plaintiff stayed in the health care unit for a week before he was sent back to general population (Def. Mo. Summ. J. UMF 33).

26. Plaintiff concedes that after surgery, Plaintiff asked a nurse if he could stay and she told him that they could not keep him there (Def. Mo. Summ. J. UMF 34).

27. While in general population, Plaintiff would have to walk to the health care unit to have bandage changes and for one of the three times he received medication (Def. Mo. Summ. J. UMF 35).

28. Plaintiff concedes that he believes he received medication approximately three times a day—the morning and evening doses would be brought to his cell, and he would go to the health care unit around 11:00 a.m.(Def. Mo. Summ. J. UMF 36).

29. Plaintiff concedes that while at Western Illinois Correctional Center, Plaintiff would go to the health care unit for bandage changes and medication before lunch. The chow hall and health care unit were just around the corner from each other. (Def. Mo. Summ. J. UMF 37).

30. Plaintiff concedes that he was not able to walk as quickly as the other inmates at Western Illinois Correctional Center. Sometimes Plaintiff would get help from other inmates. . Plaintiff had a slow walk permit at Western so that he could be called out first for the line movement. (Def. Mo. Summ. J. UMF 38).

31. Plaintiff concedes that he did not have any problems physically walking, the problems that he had were due to his eye problems. (Def. Mo. Summ. J. UMF 39).

32. Plaintiff concedes that he was never injured while walking from his cell house to any other place at Western Illinois Correctional Center (Def. Mo. Summ. J. UMF 40).

33. Plaintiff concedes Plaintiff was never deprived of the ability to go to the chow hall or health care unit at Western Illinois Correctional Center (Def. Mo. Summ. J. UMF 41).

34. Plaintiff concedes that he was able to go to the visiting room and the commissary at Western Illinois Correctional Center (Def. Mo. Summ. J. UMF 42).

35. Plaintiff concedes that he did not go to the yard that often, even though the yard was just outside of his building (Def. Mo. Summ. J. UMF 43).

36. Plaintiff concedes that he was offered gym time at Western Illinois
    Correctional Center, but did not go to the gym because he felt it
    was too small (Def. Mo. Summ. J. UMF 44).

37. Plaintiff concedes that he told some officers and a lieutenant that
    his housing unit was too far from the health care unit, and that he
    spoke to a nurse, a doctor, someone in Internal Affairs, and a
    counselor (Def. Mo. Summ. J. UMF 45).

38. Plaintiff concedes that he was moved to a housing unit closer to the
    healthcare unit just before he left Western Illinois Correctional
    Center (Def. Mo. Summ. J. UMF 46).

39. Plaintiff concedes that aside from asking to be moved closer to the
    health care unit, Plaintiff did not ask for any other arrangements
    related to his eye injury. (Def. Mo. Summ. J. UMF 54).

40. Plaintiff concedes that he did not ask to speak with an ADA
    coordinator at the prison. Plaintiff further concedes that he does
    not know what an ADA coordinator is, nor did Plaintiff know there
    was one at the prison. (Def. Mo. Summ. J. UMF 59).

41. Plaintiff concedes he was released from IDOC custody on
    November 9, 2017. (Def. Mo. Summ. J. UMF 60).

**B.  Disputed Material Facts**

1. Plaintiff disputes that besides for the incident with the water,
   Plaintiff testified that he did not have any other specific incidents

8

with Sample prior to the date of the assault. (Def. Mo. Summ. J. UMF 10) That is a misstatement of the Plaintiff's testimony. (Def. Ex. 1, 11:3-7)

2. Plaintiff disputes that Defendant Gatewood testified that he was required to walk throughout the dorm several times during his shift and to conduct mandatory count checks (Def. Mo. Summ. J. UMF 24). This is a misstatement of the Defendant's testimony (Def Ex. 2, 13).

3. Plaintiff disputes that he was rushed to the health care unit to see medical staff the afternoon of June 14, 2015. (Def. Mo. Summ. J. UMF 21) Plaintiff told the doctor that the attack happened around 1:30 PM (Pl. Ex. A[1]). At 3:05 P.M., Officer Slagle saw Plaintiff at the phone with a rag over his eye and sent Plaintiff to the Health Care Unit (Pl. Ex. B).  He did not see a nurse until 3:30 PM. (Pl. Ex. C[2]).

4. Plaintiff disputes that after his shift in J Dorm ended, Defendant Gatewood worked overtime on the second shift in a different dorm and was called at roughly 3:30 and told that an inmate had been injured (Def. Mo. Summ. J. UMF 25). Defendant Gatewood

---

[1] This exhibit is the subject of a protective order and a document designated "Attorneys Eyes Only." In compliance with the protective order, Plaintiff has filed a Motion for Leave to file this Exhibit under seal.
[2]  This exhibit is the subject of a protective order and a document designated "Attorneys Eyes Only." In compliance with the protective order, Plaintiff has filed a Motion for Leave to file this Exhibit under seal.

worked his 7:00-3:00 PM shift that day and no additional shifts
(Pl. Ex. D, pg. 54:24; 55:1; Pl. Ex. E).

5.  Plaintiff disputes that Defendant Gatewood later learned that
Plaintiff had been injured by inmate Sample (Def. Mo. Summ. J.
UMF 26). Plaintiff told the doctor that he was injured at 1:30 PM
(Pl. Ex. A). Defendant Gatewood saw at Plaintiff at 2:50 PM (Def.
Ex. 4). Furthermore, at approximately 3:20, Defendant Gatewood
saw Plaintiff walking to the health care unit, holding his face, and
requiring the assistance of another inmate (Def. Ex. 2, pp.
22:16-19, 41:9-24)

6.  Plaintiff disputes the veracity of the Incident Report written by
Defendant Gatewood, noting that he did not see Plaintiff injured,
and that he had performed the last dorm check on June 14, 2015, at
2:30 p.m. and observed Plaintiff to be uninjured at that time (Def.
Mo. Summ. J. UMF 27). Defendant Gatewood's Incident Report is
unclear whether he saw Plaintiff at 2:30 or 2:50 PM (Def. Ex. 4).

7.  Plaintiff disputes Defendant Gatewood wrote an incident report
because he had information that the injury to Plaintiff may have
happened during his shift, but had not been brought to his attention
then and wanted to ensure that he documented what he observed
the last time he walked through J Dorm that day (Def. Mo. Summ.
J. UMF 28). Defendant was informed that there was a danger

10

before the day of the attack and on the day of the attack. (Def. Ex.

1, pg. 14:1-3, 16:7-8, 20:5-10, 91:5-14; Pl. Ex. K; Pl. Ex. L; Pl. Ex.

M; Pl. Ex. F; Pl. Ex. G)

8.  Plaintiff disputes Defendant Gatewood was never approached by

anyone with concerns about their safety regarding inmate Sample

before the altercation (Def. Mo. Summ. J. UMF 29). Plaintiff

informed Defendant there was likely going to be an altercation and

that he was concerned for his safety prior to the day of the attack

and at least three times the day of the attack. (Def. Ex. 1, pg.

14:1-3, 16:7-8, 20:5-10, 91:5-14; Pl. Ex. K; Pl. Ex. L; Pl. Ex. M;

Pl. Ex. F; Pl. Ex. G). Further, Defendant Gatewood testified that he

was aware of Inmate Sample's previous disciplinary history. (Pl.

Ex. D, pg. 20:1-6).

9.  Plaintiff disputes that after Plaintiff arrived at Western Illinois

Correctional Center, he stayed in the health care unit for

approximately two weeks before he was sent to general population

(Def. Mo. Summ. J. UMF 30). Plaintiff's movement log and

Cumulative Counseling Summary does not indicate that he was

initially held in the health care unit (Def. Ex. 7 & Pl. Ex. H).

10. Plaintiff disputes that while at Graham Correctional Center,

Plaintiff would have to walk to the chow hall for meals, attend the

yard, commissary and gym at Graham Correctional Center (Def.

Mo. Summ. J. UMF 49) insofar as Defendants fail to state that

Plaintiff would attend the gym at Graham because they had a

special gym for those with a physical disability, unlike Western

(Def. Ex. 1, pp. 56:16-20).

11. Plaintiff disputes that IDOC rules provide that: "All decisions

regarding ADA accommodation shall be made on an individual

case-by-case basis," (Def. Mo. Summ. J. UMF 55) insofar as the

use the use of the ADA Directive implies that it has any

application to visually impaired inmates. It only applies to inmates

with hearing impairments (Def. Ex. 5).

12. Plaintiff disputes that IDOC rules require that inmates make a

request for accommodation to a facility ADA Coordinator if

needed for a disability. (Def. Mo. Summ. J. UMF 56). The

Defendant's 30(b)(6) witness testified that ADA accommodations

can and have been made through the grievance process (Pl. Ex. I,

pg. 29:15-19).

13. Plaintiff disputes that he was advised of that rule in the inmate

handbooks for the prisons in which he was housed. (Def. Mo.

Summ. J. UMF 58). Defendants have failed to provide any

evidence that Plaintiff received the handbook. In addition,

Defendants have failed to provide the handbook in discovery[3] or

---

[3] Plaintiff has gone through all correspondence, electronic and otherwise, and been unable to find any documents tendered beyond IDOC 1069.

the entirety of the handbook in its Motion. Furthermore, Plaintiff

had never heard of an ADA coordinator and did not know there

was one at the institution (Def. Ex. 1, 87:1-10).

14. Plaintiff disputes that Plaintiff is out of IDOC custody and is able

to drive (Def. Mo. Summ. J. UMF 61) insofar as the Defendant

fails to acknowledge that Plaintiff receives assistance from his wife

and his sister and cannot drive without glasses that he did not

previously require (Def. Ex. 1, 84:11-15).

15. Plaintiff disputes that he is still able to walk (Def. Mo. Summ. J.

UMF 62) insofar as the Defendant fails to acknowledge that

Plaintiff receives assistance from his wife and his sister (Def Ex. 1,

84:18-22).

16. Plaintiff disputes that he has only suffered scratches and bruises,

nothing more serious (Def. Mo. Summ. J. UMF 63). Plaintiff has

suffered a lack of balance since his injury and fallen down between

15 and 20 times (Def. Ex. 1, 93:3-10)

**C. Disputed Immaterial Facts**

**D. Undisputed Immaterial Facts**

1. Plaintiff concedes in May 2016, Plaintiff was transferred to

Graham Correctional Center (hereinafter "GCC") (Def. Mo.

Summ. J. UMF 47). This is immaterial, as GCC is not listed as a

litigant and the activity that occurred there is not relevant to the case.

2.  Plaintiff concedes that at GCC, Plaintiff would have to go to the health care unit three times each day for his medication. (Def. Mo. Summ. J. UMF 48). This is immaterial, as GCC is not listed as a litigant and the activity that occurred there is not relevant to the case.

3.  Plaintiff concedes that he also had a slow walk permit at GCC. (Def. Mo. Summ. J. UMF 50). This is immaterial, as GCC is not listed as a litigant and the activity that occurred there is not relevant to the case.

4.  Plaintiff concedes that he never missed meals or showers at GCC. (Def. Mo. Summ. J. UMF 51). This is immaterial, as GCC is not listed as a litigant and the activity that occurred there is not relevant to the case. Further, one does not need to be entirely unable to partake in a life activity for it to be substantially limited under the ADA. See *Branham v. Snow,* 392 F.3d 896, 902 (7th Cir.2004).

5.  Plaintiff concedes was always able to make it to the health care unit at GCC. (Def. Mo. Summ. J. UMF 52). This is immaterial, as GCC is not listed as a litigant and the activity that occurred there is not relevant to the case. Further, one does not need to be entirely

unable to partake in a life activity for it to be substantially limited under the ADA. See *Branham v. Snow,* 392 F.3d 896, 902 (7th Cir.2004).

6.  Plaintiff concedes that at GCC, he asked the lieutenant, an officer, and some medical staff about being moved closer to the health care unit. (Def. Mo. Summ. J. UMF 53). This is immaterial, as GCC is not listed as a litigant and the activity that occurred there is not relevant to the case.

7.  IDOC rules provide that disabled offenders "shall not be permanently housed in an infirmary unit unless medical treatment is otherwise required." (Ex. 5, p. 2, F.3). (Def. Mo. Summ. J. UMF 57). This is immaterial because there is no evidence to suggest that Mr. Moore was seeking to be permanently housed in the infirmary.

**E.  Additional Material Facts**

1.  From the place where a correctional officer sat in the front of the dorm, they would be able to see the majority of the dorm (Pl. Ex. J, pg. 29:19-24).

2.  Correctional officers are trained to be alert and make determinations as whether there will be violence among the inmates (Pl. Ex. J, pg. 43:14-24; 44:1-11).

3.  Correctional officers are expected to remain in the shift were they are assigned until the end of their shift. (Pl. Ex. D, pg. 55:4-9).

4. It is mandatory that a correctional officer tour the dorm to which he is assigned every half-hour (Pl. Ex. J, pg. 30:3-4).

5. There was a sign in book in the back of J Dorm that a correctional officer was to sign when he toured the dorm (Pl. Ex. D, pg. 20:1-6).

6. The sign in book was right next to the showers. The showers were open and a correctional officer would be unable to avoid checking the showers when signing the sign in book. (Pl. Ex. D, pg. 22:10-15)

7. Defendant Gatewood was aware of previous disciplinary issues with Inmate Sample. (Def. Ex. 2, pg. 28:12-15).

8. Plaintiff had been asking the morning shift correctional officer, Defendant Gatewood, if he could be moved away from Inmate Sample prior to the attack (Def Ex. 1, pg. 14, 16:7-8).

9. Defendant Gatewood worked his 7:00-3:00 PM shift that day and no additional shifts (Pl. Ex. D, pg. 54:24; 55:1; Pl. Ex. E).

10. At some point on June 14, 2015, Plaintiff saw Inmate Sample trying to break into his property box and confronted him about it. Additionally, Mr. Moore told Defendant Gatewood about this confrontation and expressed concern that there would be another altercation. (Pl. Ex. K; Pl. Ex. L; Pl. Ex. M).

11. Plaintiff returned from lunch around noon and spent a couple hours around his bunk with other inmates (Def Ex. 1, pg. 17:22-24-18:1-3).

12. After lunch, Mr. Moore saw Inmate Sample again. (Def. Ex. 1, pg. 15:12-15).

13. After lunch, Mr. Moore approached Defendant Gatewood again and asked to be moved away from Inmate Sample (Def. Ex. 16:9).

14. Count was conducted at 12:00, 3:00, and 9:00 (Def Ex. 1, pg. 18:12-13). Plaintiff did not leave his bunk after lunch so he could be present for count (Def Ex. 1, pg. 18:11-12).

15. At some point after lunch, Sample came around Plaintiff's bunk area and began "horseplay." Plaintiff asked him "[W]ould you please get out of my area" (Def. Ex. 1, pg. 19:3-7)

16. Imate Sample was upset that Plaintiff was asking him to stop and said some words to him. (Def. Ex. 1, pg. 19:21-23 & 20:1-3).

17. Plaintiff informed Defendant Gatewood that he had had another altercation with Sample. (Def. Ex. 1, pg. 20:5-10).

18. Plaintiff informed Defendant about the problems he was specifically having with Inmate Sample approximately five times (Def. Ex. 1, pg. 91:5-14).

17

19. Xavier Brownlee witnessed one of the occasions where Plaintiff asked Defendant Gatewood to move him away from Sample (Pl. Ex. F)

20. Plaintiff spoke to his wife daily and told his wife about the encounters he had with Inmate Sample. He additionally told her that he had informed the correctional officer about his concerns. Plaintiff told his wife that on one occasion, he handed Defendant Gatewood a written note and Defendant Gatewood crumpled it up and threw it away. (Pl. Ex. G).

21. When Mr. Moore returned to his bunk after speaking with Defendant Gatewood again, Inmate Sample said something to Mr. Moore and he was hit. (Def. Ex. 2, pg. 20:15-17).

22. Inmate Sample had a key in between his fingers and was trying to hit Mr. Moore in the neck, but instead hit him in the eye. (Def. Ex. 2, pg. 20:21-24).

23. When Inmate Sample pulled his arm back, he pulled Mr. Moore's left eye out of its socket. (Def. Ex. 1, pg. 21:1-4)

24. Mr. Moore felt the pain immediately after he was hit. (Def. Ex. 1, pg. 22:11-13). He testified that the pain he experienced was a 10 out of 10. (Def. Ex. 1, pg. 22:14-16).

25. Defendant Gatewood testifies that he did not see Plaintiff and Inmate Sample interact that day (Def. Ex. 2, 13:15-17).

26. Defendant Gatewood did not see Plaintiff playing cards on June 14, 2015. (Def. Ex. 2, pg. 24:5-7).

27. Defendant Gatewood testified that he did not see any odd behavior the day of the attack. (Def. Ex. 2, pg. 39:12-24)

28. Officer Slagle worked the 3:00-11:00 PM shift and his shift did not overlap with Defendant Gatewood (Kinney Dep. 28:7-11)

29. Officer Slagle saw Plaintiff between 3:00 and 3:05 and his eye was already injured (Kinney Dep. 24:22-24; 25:1-3; IDOC 0005).

30. Defendant Gatewood saw Plaintiff going to healthcare between 3:20-3:30 holding his face and receiving assistance from another inmate (Def. Ex. 2, pp. 22:16-19 & 41:9-24).

31. Major Kinney called Defendant Gatewood at approximately 3:30 to tell him an inmate had been injured (Def. Ex. 2, pg. 21:17-24).

32. Defendant Gatewood completed an incident report on 6/14/15 at 4:50 PM stating that he saw Plaintiff around 2:50 and he was uninjured (Def Ex. 2, pg. 45:14-18; Ex. D, pg. 26:1-4; Def. Ex. 4).

33. Defendant Gatewood  completed an incident report because the injury occurred during his shift. (Def. Ex. 2, pg. 46:1-6).

34. Defendant waited to complete his incident report until he received the gym list. (Def. Ex 2, pg. 47:21-24).

35. The inmates at Vandalia were provided keys to keep their lockboxes locked (Def. Ex. 2, 36:1-5).

36. The inmates at Vandalia have had access to keys for the padlocks for at least 23 years (Ex. D, pg. 47:21-24).

37. Violence among inmates is not uncommon (Ex. D, pg. 48:1-3).

38. The injury to his eye also caused nerve damage to the ring finger of Plaintiff's right hand, causing it to seize up and requiring surgery. (Def. Ex. 1, 23:7-23).

39. Following the day of the attack, several inmates allegedly gave statements about what occurred between Mr. Moore and Inmate Sample. (Pl. Ex. Q[4])

40. During the time he was in the health care unit, Plaintiff occasionally would deny medical care because the nurse didn't was their hands and didn't wear gloves (Def. Ex. 1, 29:1-4).

41. On July 21, 2015, Plaintiff agreed to enucleation. Enucleation was completed on September 3, 2015 (Def. Ex. 3, pp. 4-5).

42. On July 31, 2015, Plaintiff filed a grievance with the Illinois Department of Corrections wherein he states that he was attacked by Keleel Sample and specifically refers to his "disability" and handicap." He further states that he warned Defendant Gatewood that there would be trouble between Inmate Sample and him and that the officers falsified the reports about the incident. (Pl. Ex. K).

---

[4] This exhibit is the subject of a protective order and a document designated "Attorneys Eyes Only." In compliance with the protective order, Plaintiff has filed a Motion for Leave to file this Exhibit under seal.

43. On August 10, 2015, Plaintiff filed a grievance with the Illinois Department of Corrections stating that he had lost sight due to an attack and that he had informed Defendant Gatewood earlier that day that he had had an altercation with his attacker. He further discusses the creation of false reports, which state he was fighting, and requests an expungement of the disciplinary mark on his record. (Pl. Ex. L).

44. On October 5, 2015, Plaintiff filed a third grievance with the Illinois Department of Corrections, alerting officials to his permanent disability and  stating that on 6-14-19 Defendant Gatewood had ignored his warnings that there was going to be an altercation between Sample and him (Pl. Ex. M).

45. Plaintiff has applied for disability (Def. Ex. 1, 86:10-12).

46. Since the injury, Plaintiff receives assistance from his wife and his sister and cannot drive without glasses that he did not previously require (Def. Ex. 1, 84:11-15).

47. Plaintiff has suffered a lack of balance since his injury and fallen down between 15 and 20 times (Def. Ex. 1, 93:3-10)

48. Dr. Raiji's, an expert opthamologist, has expressed the opinion that "Walking back and forth long distances to receive eye drops 5x/day is not reasonable, especially given Mr. Moore's pain level and monocular status." (Def. Ex. 3, p. 4).

49. There is not an ADA directive for inmates that are visually impaired (Pl. Ex. I, pg. 31:12-23)

50. Some inmates use the grievance system to request ADA accommodations. (Pl. Ex. I, pg. 29:15-19)

51. If an inmate were to bring up his disability in a grievance, it is supposed to be brought to the attention of the ADA coordinator. (Pl. Ex. I, pg. 28:20-23 & 29:19-21) and tracked (Pl. Ex. I, pg. 29:5-8).

52. It is not uncommon for IDOC to relocate a visually impaired inmate closer to the services he requires (Pl. Ex. I, pg. 37:1-6).

53. Mr. Moore's July and August grievances were partially addressed in February 2016 and did not discuss his disability. (Pl. Ex. N IDOC 944).

54. On October 8, 2015, the Defendants refused to review Mr. Moore's October 5, 2015 grievance, and sent it back without consideration stating "You must write this yourself" (Pl. Ex. O).

55. Mr. Moore had to request the assistance of another inmate to draft his grievance because his visual impairment prevented him from doing so (Pl. Ex. P)

56. There is no policy preventing an inmate from filing a grievance drafted by a third party. (Pl. Ex. I, pg. 35:11-19)

57. Mr. Moore was housed in Unit 4 at Western Correctional Center, which is all the way in the back of the institution. (Def. Ex. 1, pg. 34:3-4)

58. With only one working eye, it would take Mr. moore 30-40 minutes to walk to the health care unit. (Def. Ex. pg. 34:12-14).

## III.  ARGUMENT

### A.  Summary Judgment Standard

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id*. The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Amer. Hoescht Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne,* 337 F.3d at 770. The evidence, and all inferences, are viewed in the light most favorable to the nonmoving party. *Equip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981).

Summary judgment is not a substitute for trial or a tool for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, once the court draws all reasonable inferences from the facts in light most favorable to the non-moving party, if there remains any genuine doubt as to the material facts and a reasonable fact-finder could rule in favor of the opposing party, summary judgment should be denied. *See Shields Enterprises, Inc. v.*

23

*First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

### B.  Qualified Immunity is Not Available Where Disputed Facts Exist

Because it remains highly disputed whether Mr. Moore informed Defendant Gatewood of his safety concerns, Defendant Gatewood is not entitled to qualified immunity or summary judgment. However, were the Court to reach an evaluation of Defendant Gatewood's qualified immunity defense, it must answer two questions: first, whether the facts, taken in the light most favorable to Plaintiff, depict a violation of a constitutional right; and second, whether that constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chicago,* 733 F.3d 749, 758 (7th Cir. 2013). The Court may answer these questions in the order it considers most suitable. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 1.   Disputed Facts Preclude Summary Judgment

A police officer is not entitled to qualified immunity where facts related to the underlying constitutional violation are disputed. *Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998). ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity. Raising a defense of qualified immunity in the face of disputed facts that control the answer to the question is a waste of everybody's time."); *Omdahl v. Lindholm,* 170 F.3d 730, 734 (7th Cir. 1999) ("[W]hether the [plaintiffs] can establish the existence of a constitutional violation turns on how a fact-finder resolves the question of fact regarding deadly force. The existence of a factual dispute prevents us from resolving the issue.").

Particularly in the context of Failure to Protect cases, the Seventh Circuit has recognized that qualified immunity is often inappropriate because the evidence surrounding the officer's indifference is often susceptible to different interpretations. See *Walker v. Benjamin*, 293 F.3d

1030, 1037 (7th Cir. 2002) (holding "[i]f there are genuine issues of fact concerning [prison officials' actual knowledge of threat to prisoner's health or safety, officials' failure to take reasonable measures, and officials' subjective intent to harm or deliberate indifference], a defendant may not avoid trial on the grounds of qualified immunity.); See also *Herman v Dodson,* No. 10–cv–564–MJR–SCW, 2012 WL 2119812 (S.D.Ill., June 11, 2012) (holding that a defendant may not avoid trial on the grounds of qualified immunity when there are genuine issues of fact concerning the elements of deliberate indifference and that defendant was not entitled to summary judgment based on qualified immunity.); See also *Grey v Abney,* NO.: 3:18-CV-040-JD-MGG, 2019 WL 4695349 (S.D. Ind., September 25,2019) (holding that disputed material facts regarding the elements of an Eighth Amendment claim precludes dismissal based on qualified immunity) (citing *Walker*, 293 F.3d at 1037). See also *Figueroa v Corrections Officer Mason*, No. 14 C 9238, 2016 WL 5477528, *4 n.3 (N.D.Ill., September 29, 2106) ("If there are genuine issues of fact concerning the elements of plaintiff's constitutional claim of deliberate indifference, then defendants cannot avoid trial on qualified immunity grounds because 'no one...could reasonably have believed that he could have deliberately ignored a known threat or danger.' Thus, in a case such as this, the constitutional deliberate indifference and qualified immunity inquiries 'effectively collapse into one.'") (citing *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996).)

Mr. Moore has testified that he made Defendant Gatewood aware that there would likely be a physical altercation between Inmate Sample and him on several occasions before the attack. AMF 8, 10, 13, 17, & 18). Furthermore, he has witnesses to that effect (AMF 19 & 20) and documentation stating he informed Defendant Gatewood about his safety concerns (AMF 42, 43,

& 44). Defendant Gatewood has testified that he had a "normal basic conversation" with Mr. Moore that day to find out if he was "going to gym, yard, barber shop, commissary." (Def. Ex. 2, pg. 14:2-4.)  As there are various material facts in dispute regarding Defendant Gatewood's knowledge of the harm Mr. Moore faced, he is not entitled to a Qualified Immunity Defense or Summary Judgment.

### C.  Defendant Gatewood is Not Entitled to Judgment as a Matter of Law for the Eighth Amendment Claim

In moving for judgment as a matter of law, the Defendants misstate the law and disregard the majority of testimony and discovery documents. When these misrepresentations of law are corrected and the entire evidentiary picture is presented, no basis exists for granting Defendants' motions for Judgment as a Matter of Law or Summary Judgment.

    1.  <u>There Is Sufficient Evidence For A Reasonable Jury To Conclude That Defendant Gatewood Was Deliberately Indifferent To Lamont Moore's Serious Safety Concerns</u>

Prisoners have a right under the Eighth Amendment not to be exposed to a serious risk of injury, and so public officials commit a Section 1983 violation when they expose a prisoner to a serious risk of injury through a deliberately indifferent act. *Wright v. Miller*, 561 F. App'x 551, 555 (7th Cir. 2014) ("The "heightened risk of future injury' a prison official intentionally or with reckless indifference inflicts on an inmate 'is itself actionable.'"), quoting *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013); *Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) ("Prison officials who recklessly expose a prisoner to a substantial risk of a serious physical injury violate his Eighth Amendment rights."); *Haley v Gross,* 86 F.3d 630, 641 (1996) ("a prisoner claiming

26

deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired. The standard for deliberate indifference 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'")(quoting *Farmer v Brennan*, 511 U.S. 825, 826 (1994).

In their Motion, the defendants only exhibit a fraction of the evidence by admitting that Plaintiff "asked Defendant Gatewood to move him away from the young guys." (Dkt. #55, pg. 10). The entirety of the evidence reveals that Mr. Moore requested to be moved and told Defendant Gatewood about his safety concerns, specifically with respect to Inmate Sample, prior to the day of the attack and at least three times that day. UMF 13 & 14; AMF 8, 10, 13, 17, & 18.

Plaintiff's warnings to Defendants are further corroborated in various documents and statements. Mr. Moore references the various warnings he gave Defendant Gatewood in each of his grievances. AMF 42, 43, & 44. In addition, Mr. Moore told his wife about the encounters he had with Inmate Sample and the warnings he gave to Defendant Gatewood on June 12, 13 and 14, 2015. AMF 20. Lastly, one of the other inmates witnessed Mr. Moore tell Officer Gatewood that he had an altercation with Inmate Sample earlier that day and was concerned about his safety. AMF 19.

In light of these facts, Gatewood's only defense has been to claim he was unaware of a safety concern. DMF 7 & 8. But this is genuinely disputed by the evidence, specifically (1) Plaintiff's testimony, (2) Xavier Brownlee's statement, (3) Latrona Moore's statement, and (4) Plaintiff's three grievances. "Read in a light most favorable to [Plaintiff], the record shows that [Plaintiff] informed the defendants four times that he was in fear, the defendants did nothing in response, and [Plaintiff] was attacked…[T]here is a genuine issue of triable fact as to whether the

defendants were deliberately indifferent." *Gallo v Smith*, 2000 WL 1763345 *3 (reversing the granting of Summary Judgment and remanding the case back to district court).

Moreover, even in the unlikely event that a jury were to believe Defendant Gatewood's sole testimony, and ignore all of the other evidence, a jury could still find sufficient evidence of Gatewood's deliberate indifference. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v Brennan*, 114 S.Ct. 1970 (1994). "The recklessness standard for deliberate indifference in Eighth Amendment claims is not that the official could be liable because he should have known, but that he cannot escape liability if it is determined that he must have known because the risk involved was so obvious." *Hannah v Gilmore,* 1996 WL 637674 *1 (7th Cir.) (citing *Farmer,* 114 S.Ct. at 1982.)

Nearly all of the inmate interviews, provided by Defendant[5], allege that Gatewood and Moore were physically fighting throughout the day. The statements provide that Plaintiff Moore and Inmate Sample caused a great deal of commotion on June 14, 2019, after fighting over a card game, and continuously left the common area to go back to the showers to physically fight. It further appears that a number of these inmates followed them into the shower to witness the altercation. AMF 39.

Correctional officers are trained to be alert and make determinations as whether there will be violence among the inmates. AMF 2. During his shift, Defendant Gatewood sits in the front part of the dorm. From that vantage point,  he can see the majority of the dorm. AMF 1. In addition, a correctional officer must tour the dorm every half-hour during his shift and cannot

---

[5] The discussion of the inmate interviews included in Defendant's Intel Investigation does not constitute an admission to the veracity of the statements

leave his dorm. AMF 4. Upon conducting his tour, Defendant Gatewood would have signed the

sign in book. AMF 5. The sign in book is right next to the open shower area and he would be

unable to avoid checking the shower area every half hour. AMF 6.

As it would be impossible for Defendant Gatewood to be unaware of the commotion

going on in the dorm for which he was responsible, he simply chose to ignore the turbulence..

See *Farmer v. Brennan,* 511 U.S. 825, 826 (1994) (holding that "[t]he subjective test does not

permit liability to be premised on obviousness or constructive notice. However, this does not

mean that prison officials will be free to ignore obvious dangers to inmates. Whether an official

had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and

a factfinder may conclude that the official knew of a substantial risk from the very fact that it

was obvious.") (citations omitted).

The only dispute is over whether, on this record, a reasonable jury could conclude that

Defendant Gatewood "realize[d] that a substantial risk of serious harm to [Moore] exist[ed], but

then disregard[ed] that risk," *Perez v. Fenoglio*, 792 F.3d 768 (2015). (See also *Farmer v.

Brennan,* 511 U.S. 825 (1994) (plaintiff must show that officials are "aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and they must also

draw the inference."). As discussed above, there are sufficient facts for a reasonable jury to

conclude that Defendant Gatewood deliberately turned a blind eye to the many warnings given to

him by Mr. Moore and, in doing so, disregarded his safety.

### D.  Plaintiff Made a Request for an Accommodation Under the ADA

Despite the facts not being on point with this case, Defendants correctly cite to *Jovanovic

v. In-Sink-Erator Div. of Emerson Elec. Co*., 201 F.3d 894, 899 (7th Cir. 2000) to support their

assertion that "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." Defendants point to the ADA directive for IDOC and the Western Illinois Correctional Center handbook to assert that Mr. Moore did not make a formal accommodation request.

However, the court should give little to no attention to the ADA directive on which Defendants rely. They use it in a skewed attempt to support their argument that Mr. Moore did not make a written request for an accommodation. But, the directive is irrelevant to the matter at hand. It is limited to accomodations for inmates who are hard of hearing and only discusses that disability. DMF 12. Obviously, accommodations for someone who is hearing impaired will be much different from accomodations for the visually impaired. There is not an ADA directive for inmates that are visually impaired. AMF 49.

The court should further disregard the Western Illinois Correctional Center Handbook, as this was never provided to Plaintiff in discovery[6]. Further, Defendants have only included a portion of the handbook. Lastly, the Defendants have failed to provide any evidence that Mr. Moore was provided this handbook.

Despite these extraneous documents, the defendants' argument further fails based upon the statements of their own 30(b)(6) witness, who has testified that inmates can and do use the grievance system to seek ADA accommodations. Some inmates "utilize the grievance system as somewhat of a -- similar to that of the request slips where an offender will file a grievance based on the request for accommodation." AMF 50. In addition, if an inmate were to bring up his disability in a grievance, it is supposed to be brought to the attention of the ADA coordinator.

---

[6] Plaintiff has gone through all correspondence, electronic and otherwise, and been unable to find any documents tendered beyond IDOC 1069.

AMF 51. If an inmate files a grievance regarding an ADA issue, the grievance is supposed to be tracked. AMF 51. Lastly, it is not uncommon for IDOC to relocate a visually impaired inmate closer to the services he requires. AMF 52.

As such, despite the irrelevant ADA directive and the incomplete and inadmissible Western IL Handbook, the policy allows for an inmate to alert the institution to his disability and bring a request for accommodations through the grievance process. This is precisely what Mr. Moore did on on July 31, 2015, August 10, 2015 and October 21, 2015, when he completed grievances specifically informing officials of his disability. (AMF 42-44). All three of these grievances should have been brought to the attention of the ADA Coordinator and each should have been tracked, pursuant to IDOC policy. Yet, this was not done with any of his grievances.

On the contrary, IDOC proactively ignored Mr. Moore's grievances. In his July 31, 2015 grievance, Mr. Moore specifically refers to his "disability" and handicap. (AMF 42). In his August 10, 2015 grievance, Mr. Moore states that he was visually impaired due to an attack. (AMF 43). These grievances were not even addressed until February 18, 2016; and even then the the Administrative Review Board only addressed Mr. Moore's claims regarding a Failure to Provide Medical Attention (AMF 53). Defendants entirely overlooked the fact that Mr. Moore was disabled.

The most egregious example of IDOC's dismissive attitude toward Mr. Moore's grievances would be the callous response to his October 5, 2015 grievance, wherein he explains that he is "permanently disabled." Defendants refused to review the grievance and sent it back without consideration, stating "You must write this yourself." (AMF 54). Mr. Moore had to request the assistance of another inmate to draft his grievance because his visual impairment

prevented him from doing so (AMF 55). There is no policy stating that an inmate cannot file a grievance drafted by someone else on his behalf. In fact, a visually impaired inmate is permitted to seek the assistance of a third party to draft a grievance informing about his disability and it would go through the regular grievance process. (AMF 56).

Additionally, Plaintiff told some officers and a lieutenant that his housing unit was too far from the health care unit. He further spoke to a nurse, a doctor, someone in Internal Affairs, and a counselor. UMF 45. No one followed up on these matters or suggested he speak to an ADA Coordinator.

The evidence shows that Mr. Moore repeatedly attempted to inform the institution that he was disabled and needed accommodations for his visual impairment. However, the institution refused to even hear him. As such, they needlessly refused his requests.

### E.  Plaintiff's Life Activities were Substantially Limited

"To be "substantially limited" in performing such an activity, a person must either be: (1) unable to perform a major life function, or (2) *significantly restricted in the duration, manner or condition under which he or she can perform a particular "major life activity*," as compared to the average person in the general population. *Peters v. City of Mauston,* 311 F.3d 835, 843 (7th Cir.2002) (emphasis added). "The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard. An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life

activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section." 29 C.F.R. § 1630.2(j)(1) & (2). However, an impairment need not cause an utter inability to perform the activity in question to constitute a substantial limitation on that activity. *Branham v. Snow,* 392 F.3d 896, 902 (7th Cir.2004). Major life activities "include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'") 29 C.F.R. § 1630.2(i); See also *Lawson* (holding that eating is a major life activity).

Defendants wrongfully focus on the fact that ultimately Plaintiff was able to get to the mess hall, the commissary and see a medical professional. However, in doing so, they completely bypass the obligations instilled by the ADA. Simply put, it is not whether Mr. Moore is or is not able to conduct these affairs. It is whether he is able to conduct them in the same manner as those around him or the "general population." 29 C.F.R. § 1630.2(j)(2).

In his deposition Plaintiff made it very clear that he was unable to conduct these significant life activities in the same manner or duration as other inmates. Mr. Moore testified that he was housed in Unit 4 at Western Correctional Center, which is all the way in the back of the institution. (AMF 57). With only one working eye, it would take him 30-40 minutes to walk to the health care unit. (AMF 58). He further testified that he had to be given a slow walk permit and he had to go to medical once a day, the mess hall, in order to eat, more than one time per day, the visiting room once a month, and the commissary regularly; all of which are near each other.

Even outside of prison, the extended duration of getting one's meals or procuring one's personal items would be considered a significant barrier to a major life activity under the ADA, because it differs from the abilities of the general populace. However, in a prison setting it is so

much worse - where one is on a strict schedule and has a limited amount to get their meal, travel

to commissary, or see a medical professional, this causes a significant barrier.

Most ridiculously, the Defendants question Dr. Raiji's expert opinion that it was

unreasonable to expect Mr. Moore to walk long distances given his disability. (Dkt. #55, p. 16).

However, they fail to provide any authority, caselaw or otherwise, to support their contention that

such unreasonable expectations did not substantially limit Mr. Moore's life activities. Once

again, these conclusory statements do not meet the standard for a Motion for Summary

Judgment. A jury could reasonably infer that Mr. Moore's inability to move at a regular pace or

travel safely to the areas required to conduct his life activities is a substantial limitation.

### F.  Other Claims

#### 1.  Failure to Provide Medical Attention

Defendants simply state that there is "no evidence to suggest that Gatewood was in any

manner involved with Plaintiff's health care" to support their argument that the Failure to

Provide Medical Attention cause of action should be dismissed (Def. MSJ p. 18). However, a

quick review of the timeline in this matter shows this is plainly untrue.

Plaintiff's injury occurred during his shift, as was the reason that he completed an

incident report. AMF 33. There is evidence that Mr. Moore was injured at 1:30. DMF 5. This

was during Defendant Gatewood's shift. AMF 9. Defendant Gatewood was mandated to tour the

facility every half-hour. AMF 4. He was also supposed to complete count at 3:00. AMF 14.

However, Defendant Gatewood did not provide Mr. Moore any medical attention. He was not

sent to the Health Care Unit until 3:05, when Officer Slagle saw his injury. AMF 29.

A jury could reasonably infer that Defendant Gatewood failed to provide Mr. Moore medical attention the last 1½ hours of his shift.

### 2.   Conspiracy

Defendants argue that the Conspiracy cause of action cannot survive because Defendant Gatewood is the only named individual. This is blatantly false, as the Plaintiff has named unknown employees of the Illinois Department of Corrections as Defendants and they have not been dismissed. As such, this argument should be disregarded.

Nevertheless, Plaintiff will explain why the Conspiracy cause of action must survive. To be liable as a conspirator, "one must be a voluntary participant in a common venture, though one need not have agreed on the details of the conspiratorial scheme ...; it is enough that one understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do one's part to further them." *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988). Courts frequently recognize the reality that a conspiracy, by definition, occurs behind closed doors, outside the presence of the object of the conspiracy. *Hoskins v. Poelstra,* 320 F.3d 761, 764 (7th Cir. 2003) (a conspiratorial "meeting of minds ... may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts"). Thus, circumstantial evidence is sufficient to survive a motion for summary judgment. *See Bell v City of Milwaukee,* 746 F.2d 1205, 1256 (7th Cir. 1984) ("Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire" and thus "circumstantial evidence may provide adequate proof of conspiracy"). *See also, Cameo Convalescent Center, Inc v Senn,* 738 F.2d 836, 840-41 (7th Cir. 1983) ("existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide.").

The evidence shows that officers drafted documents that alleged Plaintiff had committed some wrongdoing, specifically that he had engaged in fighting with Inmate Sample over a card game. These documents resulted in disciplinary action against Plaintiff. Plaintiff has repeatedly stated in his grievances that this was a fabrication and that he not only was not playing cards, but he was also not fighting with Inmate Sample. He further states in his grievances that the officers did this to conceal their own wrongdoing for failing to protect him from the attack. AMF 42, 43 & 44.

Given the evidence of a conspiracy in the record, summary judgment on Plaintiff's conspiracy claim must be denied. *See Jones v City of Chicago,* 856 F.2d 985, 992-993 (7th Cir. 1988)

### 3. Respondeat Superior

Plaintiff has conceded that this cause of action is inappropriate (See Dkt #58)

### 4. Indemnification

Plaintiff has corrected his misstatement regarding the citation of the appropriate statute. (See Dkt #58)

### 5. Intentional Infliction of Emotional Distress (hereinafter "IIED")

Defendants admittedly invoke their previously failed arguments in their initial Motion to Dismiss in order to attack Plaintiff's cause of action for IIED. Setting aside the fact that the standard for a Motion to Dismiss is markedly different from the standard for a Motion for Summary Judgment, Defendants make no valid argument that there are any undisputed facts supporting their argument that Defendants' deliberate indifference to Plaintiff's safety, causing

him to be attacked and resulting in him losing an eye in such a heinous manner. As such,

Defendants have waived the argument.

Despite this waiver, Plaintiff will address the many pieces of evidence supporting his

IIED claim. Days before the attack, Plaintiff had been asking Defendant Gatewood to be moved

away from Inmate Sample. AMF 8. On June 14, 2015, Plaintiff found Inmate Sample trying to

break into his property box and confronted him. Plaintiff told Defendant Gatewood about the

confrontation and expressed concern that there would be another altercation. AMF 10. Plaintiff

spoke with Defendant Gatewood two more times on June 14, 2015, asking to be moved and told

him about the safety concerns he had about Inmate Sample. AMF 13 & 17. On one of the

occasions, Mr. Moore gave Defendant Gatewood a written note, which he crumbled up and

threw away. AMF 20.

With these pieces of evidence, a jury could conceivably find that by ignoring Plaintiff's

many warnings, Defendant Gatewood engaged in extreme and outrageous conduct that recklessly

caused severe emotional distress to Plaintiff.

IV.     **Conclusion**

WHEREFORE, for the many reasons listed above, Plaintiff requests this court enter an

Order denying Defendants' Motion for Summary Judgment and awarding any other relief this

court deems just.

DATED: October 21, 2019

s/ Kellie Walters
The Walters Law firm
350 N. Orleans St., Ste. 9000N
Chicago, IL 60654
(312) 428-5890
kwalters@walterslawoffice.net

## CERTIFICATE OF SERVICE

I hereby certify that I have caused true and correct copies of the Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to be served upon all interested parties, through the Court's electronic filing system, on this 21st day of October, 2019.

s/ Kellie Walters