E-FILED
Monday, 21 October, 2019 11:36:37 PM
Clerk, U.S. District Court, ILCD

Deposition of:
# Major Brian Kinney

**Date:** April 16, 2019

**Case:** Lamont Moore v. Western Illinois Correctional Center, et al.

**Reporter:** Beverly Hopkins, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

Plaintiff Ex. D

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LAMONT MOORE,                        )
                                     )
              Plaintiff,             )
                                     )
vs.                                  )  No. 16-3289
                                     )
WESTERN ILLINOIS CORRECTIONAL        )
CENTER, VANDALIA CORRECTIONAL        )
CENTER, OFFICER GATEWOOD, AND        )
UNKNOWN ILLINOIS DEPARTMENT OF       )
CORRECTIONS EMPLOYEES,               )
                                     )
              Defendants.            )

DEPOSITION OF MAJOR BRIAN KINNEY
Taken April 16, 2019

Reporter:  Beverly S. Hopkins, RPR

IL CSR No. 084-004316, MO C.C.R. No. 968

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1                      APPEARANCES:

 2
     For Plaintiff:
 3   By Kellie Walters, Esq.
     (appearing telephonically)
 4   The Walters Law Firm
     350 N. Orleans Street
 5   Suite 9000N
     Chicago, IL  60654
 6
     For Defendants:
 7   By Lisa A. Cook, Esq.
     Office of the Attorney General
 8   Assistant Attorney General
     General Law Bureau
 9   500 S. Second Street
     Springfield, IL  62706
10

11                 INTERROGATION INDEX
                                          Page
12
     Direct Examination by Ms. Walters      4
13   Cross-Examination by Ms. Cook         66
     Redirect Examination by Ms. Walters   72
14

15                      EXHIBITS

16   (No exhibits were marked by the reporter.)

17

18

19

20

21

22

23

24
```

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1           IT IS STIPULATED AND AGREED by and

2    between counsel for Plaintiff and counsel for

3    Defendants that the deposition of MAJOR BRIAN

4    KINNEY may be taken pursuant to and in accordance

5    with the Federal Rules of Civil Procedure, by and

6    on behalf of the plaintiff, on April 16, 2019, at

7    the Vandalia Correctional Center, Highway 51,

8    Vandalia, Illinois, before Beverly S. Hopkins, a

9    Certified Shorthand Reporter and Registered

10   Professional Reporter; that the issuance of

11   notice is waived, and that this deposition may be

12   taken with the same force and effect as if all

13   Federal Rules had been complied with.

14       IT IS FURTHER STIPULATED AND AGREED that

15   any and all objections to all or any part of this

16   deposition are hereby reserved and may be raised

17   at the trial of this cause; and that the

18   signature of the deponent is waived.

19           (The deposition began at 8:56 a.m. and

20           finished at 10:33 a.m.)

21       MAJOR BRIAN KINNEY, produced, sworn, and

22   examined as a witness on behalf of the plaintiff,

23   testified and deposed as follows:

24

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1                  DIRECT EXAMINATION
 2  BY MS. WALTERS:
 3       Q.   Major Kinney, is that the correct way
 4  to approach your name?
 5       A.   That will work fine.
 6       Q.   Okay.  Major Kinney, just a few
 7  questions before we begin.  Have you ever been
 8  deposed before?
 9       A.   No, ma'am.
10       Q.   Okay.  Well, there's just a couple of
11  simple rules, but for the most part it's a
12  pretty -- pretty harmless process.  I'm just
13  going to ask you a series of questions today.  It
14  shouldn't take that long, to be perfectly honest,
15  but of course that sort of depends on the
16  answers.  What I will need you to do is answer
17  audibly, not just because the court reporter has
18  to be able to take down your answer and create a
19  transcript, but in this unusual case I'm there
20  telephonically and I need to be able to hear your
21  answer as well.  So please no shakes of the head
22  or nods, okay?
23       A.   Yes, ma'am.
24       Q.   Okay.  In addition, you know, if you
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    need to go use the bathroom or need a cup of

2    coffee or glass of water, what have you, a

3    Snickers bar, it doesn't matter, you know, just

4    feel free to say that you need it.  But what I do

5    ask is that before you get up to take a break as

6    such, please do so when there is not a question

7    pending, okay?

8            A.   Yes, ma'am.

9            Q.   If there is any question that is not

10   clear that I ask you, and I almost guarantee that

11   will happen, please just ask me to rephrase or

12   clarify the question, otherwise I will be under

13   the impression and I will assume that you did

14   understand my question, okay?

15           A.   Yes, ma'am.

16           Q.   Okay.  Are you -- have you ever taken

17   -- or strike that.  Have you taken any substances

18   in the last 24 hours that will affect your

19   ability to answer my questions today?

20           A.   No, ma'am.

21           Q.   Okay.  And before I get any further,

22   let's just get it on the record too that this is

23   the deposition of Major Brian Kinney in the case

24   Moore vs. Illinois Department of Corrections,

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    et al, Case Number 16-3289 in the United States

2    District Court for the Central District of

3    Illinois, Springfield Division, and this

4    deposition is being taken pursuant to all

5    relevant Federal Rules of Civil Procedure and

6    local rules.  I am Kellie Walters and I represent

7    the plaintiff.

8              MS. WALTERS:  Lisa, do you want to

9    announce yourself?

10             MS. COOK:  Yeah, Lisa Cook is here,

11   and I represent the defendants and I'm also here

12   as a representative for Mr. Kinney for this

13   deposition.

14             MS. WALTERS:  Oh, you are representing

15   Mr. Kinney for this?

16             MS. COOK:  Yes.

17             MS. WALTERS:  Okay, I was not aware of

18   that.

19        Q.   All right.  Mr. Kinney, have you

20   discussed this case with anyone other than your

21   attorney?

22        A.   No, ma'am.

23        Q.   Okay.  Did you review any documents

24   prior to this deposition today?

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        A.    Yes, ma'am.
 2        Q.    Can you tell me which documents those
 3  are?
 4        A.    I received the incident reports that
 5  were written at the time, the copy of the Notice
 6  for Deposition, the yard gym list from that night
 7  or that day, and --
 8        Q.    I'm sorry, can you repeat that?
 9        A.    The gym list for -- from the day that
10  this incident happened.
11        Q.    Okay.
12        A.    And some copies of notes that inmates
13  wrote that came out of the dormitory after the
14  incident happened and also my reportable at the
15  time to the warden.
16        Q.    Report to the warden?
17        A.    The reportable that I wrote to the
18  warden, yes, ma'am.
19        Q.    Okay.  We're going to go over a lot of
20  the documents today, so that's nice you have
21  reviewed those.  Did you review those this
22  morning?
23        A.    When I was first contacted about the
24  case, I asked for copies of these from Chris.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1   What's his last name?
 2           MS. COOK:  Butkauskas.
 3      A.   Butkauskas from the institution
 4   because quite frankly, ma'am, I didn't remember
 5   this incident at all.
 6      Q.   Well, it's been a while so I'm not
 7   surprised.  Who is Chris Butkauskas, if I'm
 8   saying that correctly?
 9           MS. COOK:  He is the -- he's the --
10      A.   The clinical services supervisor I
11   think, ma'am.
12           MS. COOK:  Yeah, and he has a dual
13   role here.  He's a litigation coordinator.  So in
14   arranging for these I went through him to, you
15   know, get the conference room and schedule the
16   deposition.
17      Q.   Okay.  All righty.  Let's see.  Can
18   you please state and spell your name for the
19   record?
20      A.   My name is Brian Kinney, B-r-i-a-n
21   K-i-n-n-e-y.
22      Q.   Okay.  And do you mind providing your
23   address to the court reporter?
24           MS. COOK:  I will object to having his
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    address on the record.

2              MS. WALTERS:  We can -- we can put it

3    under seal, the deposition under seal if that's

4    necessary or go off the record.

5              MS. COOK:  We can go off the record.

6              (A discussion is held off the record.)

7        Q.   How long have you been living at that

8    address?

9        A.   Three years.

10       Q.   Thank you.  And who currently employs

11   you?

12       A.   I'm retired.

13       Q.   You are retired?

14       A.   Correct.

15       Q.   And when did you retire?

16       A.   December 31st, 2015.

17       Q.   Okay, congratulations.  I look forward

18   to that day myself.  Prior to your retirement,

19   where were you employed?

20       A.   Vandalia Correctional Center.

21       Q.   Okay.  How long were you employed

22   there?

23       A.   Twenty-three years.

24       Q.   And what was your title?

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1          A.    My last title?

2          Q.    Uh-huh.

3          A.    Shift supervisor, major, 3 to 11

4     shift.

5          Q.    Okay.  Shift supervisor major is the

6     same title?

7          A.    Shift supervisor is the payroll title.

8     Major was my rank.

9          Q.    Okay.  What did you do in that

10    position?  What were your day-to-day duties?

11         A.    Hang on.  I actually have that written

12    down.

13         Q.    Oh, that's perfect then.

14         A.    Shift supervisor as defined by the

15    State.  The description and duties and essential

16    functions.  Supervises and directs a security

17    force in housing and custodial programs on an

18    assigned shift.  Serves as a full-line

19    supervisor.  Assigns and reviews work.  Provides

20    guidance and training to assist staff.  Counsels

21    staff regarding work performance.  Reassign staff

22    to meet day-to-day operating needs.  Coordinates

23    and directs security inspections.  Establishes

24    annual goals and objectives.  Approves time off.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    Adjustment -- adjusts first level grievances.

 2    Effectively recommends and imposes discipline up

 3    to and including discharge.  Signs performance

 4    evaluations.  Implements and maintains programs

 5    conducive to security and rehabilitative needs of

 6    inmates.  Conduct security investigations.

 7    Verifies compliance of administrative and

 8    institutional directives and policies.  Prepares

 9    a variety of reports.  Implements policies and

10    procedures.  Receives and improves roster

11    management sheets for shift assignments.

12    Conducts roll call.  Documents late arrival,

13    early departure and absent staff.  Completes roll

14    call sign-in sheets with appropriate

15    documentation and submits to appropriate parties.

16    Coordinates security for vocational, educational

17    treatment, activity-based programs.  Directs

18    placement and security assignment office.

19    Provides signature approval for inmate

20    assignments.  Review segregation placement of

21    inmates.  Participates in clinical, professional,

22    administrative meetings.  Acts as duty warden

23    addressing issues which arise.  Prepares and

24    submits various reports, warden's monthly and
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1   activity reports, performance of evaluations,

2   unusual incidents, discipline referrals and

3   revise procedures.  Performs other duties as

4   required or assigned which are reasonably within

5   the scope and the duties enumerated above.

6        Q.   All right.  How long did you hold that

7   position.

8        A.   A little over three years.

9        Q.   Okay.  And what were you doing prior

10  to that?

11       A.   I was a lieutenant.

12       Q.   Lieutenant, okay.  Were you also shift

13  supervisor?

14       A.   Not as a lieutenant, ma'am.  Shift

15  supervisor is a major's position.  It can be TA'd

16  by a lieutenant but it is not held that as a

17  payroll title.

18       Q.   Okay.  And how long were you

19  lieutenant?

20       A.   A little over three years.

21       Q.   And what did you do as lieutenant?

22  What were your day-to-day activities?

23       A.   That, ma'am, I did not bring with me.

24       Q.   Okay.  Can you give me just a general?
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1          A.   I followed the orders that were given
2    to me by my shift supervisor, but for a 104 list
3    of what my day-to-day duties were, ma'am, I would
4    have to look that up.  I can get that back to you
5    if you need me to.
6          Q.   Maybe.  We'll see.  I don't know if we
7    need to go there, but I do appreciate that.
8    Okay, prior to lieutenant, what was your
9    position?
10         A.   I was correctional officer.
11         Q.   Okay.  And all of this was at
12   Vandalia, correct?
13         A.   Correct.
14         Q.   And how long were you a correctional
15   officer?
16         A.   Twenty-three minus six --
17         Q.   Okay.
18         A.   -- so 17 years.
19         Q.   Was that 27 years?
20         A.   No, I was -- a total was 23 years.  So
21   23 years minus six.  Three years as a major,
22   three years as a lieutenant, and 17 years as a
23   correctional officer.
24         Q.   All right.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1         A.   And I had several appointments and
2    duties as a correctional officer as well as
3    lieutenant and major.
4         Q.   Several appointments, is that what you
5    said?
6         A.   Correct.
7         Q.   And what do you mean by that?
8         A.   There are other jobs that you are
9    appointed to to help command staff inside the
10   facility, and they could be anything from
11   facility auditor to auditor coordinator, outside
12   law enforcement, all -- there's many different
13   back-up assignments that a correctional officer
14   can fill after training.
15        Q.   Okay.  Mr. Kinney, before we go much
16   further, can you give me your date of birth?
17        A.   5/7/1959.
18        Q.   Thank you.  And prior to working at
19   Vandalia, where did you work?
20        A.   Orkin Pest Control.
21        Q.   Orkin Pest Control?
22        A.   Correct.
23        Q.   My father worked there.  What town was
24   that in?
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1          A.   At the time it was Marion, Illinois.

 2          Q.   How long did you work there?

 3          A.   Six years.

 4          Q.   Okay.  Did you quit or were you

 5    terminated?

 6          A.   I was there when the coal mines closed

 7    down and everything downsized, so a little of

 8    everything.  Laid off, terminated, quit.  There

 9    was no job left anymore, ma'am.

10          Q.   Okay.

11          A.   I was the service manager.

12          Q.   And prior to Orkin, where did you

13    work?

14          A.   United States Air Force.

15          Q.   And what was your last rank there?

16          A.   Sergeant.

17          Q.   Okay.  How long were you in the Air

18    Force?

19          A.   Five years and seven months.

20          Q.   And how long were you sergeant?

21          A.   A year.

22          Q.   Did you leave the United States Air

23    Force on positive circumstances?

24          A.   I was honorably discharged, yes,
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1   ma'am.

2          Q.   Okay, thank you.  As a sergeant within

3   the United States Air Force, what did you -- what

4   were your day-to-day activities and duties?

5          A.   I performed pest control services at

6   Eglin Air Force Base in Florida.

7          Q.   Did you do that for your entire five

8   years?

9          A.   Yes, ma'am.  Not at Eglin, but the

10  same job.

11         Q.   Okay.  And prior to the Air Force,

12  where -- where were you working?

13         A.   I was in college.

14         Q.   You were in college, okay.  And what

15  college did you attend?

16         A.   Southern Illinois University at

17  Edwardsville.

18         Q.   Did you graduate?

19         A.   No, ma'am.

20         Q.   How many years did you attend?

21         A.   Five.

22         Q.   Did you obtain any -- did you obtain

23  an associate's?

24         A.   No, ma'am.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1      Q.    While you were studying there, did you
2  study any particular -- any one specific area?
3      A.    My major was in psychology, minor was
4  in speech communication.
5      Q.    Okay.  Mr. Kinney, I'm going to go to
6  the incident that brings us here today.  After
7  your review of the documents I'm sure you're
8  familiar with or have some sort of recollection
9  of June 14th, 2000 and -- what was it, '15?  Yes.
10  Do you remember that day?
11      A.    I remember the paperwork, ma'am.
12      Q.    Okay.  Do you have any independent
13  recollection of it?
14      A.    No, ma'am, I don't.  That's why I had
15  to request the paperwork.
16      Q.    Okay.
17      A.    You have to understand that inmate
18  altercations are a daily thing and sending
19  inmates out is not an unusual incident.
20      Q.    I believe that.  Do you have any
21  independent recollection of anything involving
22  that day?
23      A.    No, ma'am.
24      Q.    Okay.  Have you spoken with Officer

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    Gatewood about this case?

 2         A.   No, ma'am, I have not.

 3         Q.   Okay.  When is the last time you saw

 4    Officer Gatewood?

 5         A.   It had to have been before I retired.

 6         Q.   Okay.  Are you familiar with the J

 7    dorm?

 8         A.   Yes, ma'am.  I've spent a few hours in

 9    J dorm.

10         Q.   Okay, just a few hours?

11         A.   Many, many, many hours.

12         Q.   That makes more sense considering how

13    long you were there, specifically the upper deck

14    of J dorm.  I believe this is where this took

15    place, is that your understanding as well?

16         A.   The paperwork does not say what part

17    of the dorm this happened in.

18         Q.   Okay.  Would you agree that it was in

19    J dorm though?

20         A.   That's what the paperwork says.

21         Q.   Okay.  I understand you weren't there

22    so you can't actually advocate us to what you saw

23    or anything.  Can you tell me a little bit about

24    J dorm?
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        A.    It's an upstairs-downstairs dorm.
 2        Q.    Okay.
 3        A.    The officer has his area up front.
 4   The inmates have an area.
 5        Q.    Okay.  The small wing doors that are
 6   gated that go to the back, that separates the
 7   inmates from the officer?
 8        A.    One gate is always left open, ma'am,
 9   and one gate is always locked.  If something
10   happens in the back of the dorm, it's easier to
11   lock one gate than two.
12        Q.    Okay.  And so correct me if I'm wrong,
13   my understanding here is that in J dorm there is
14   a front area and a back area and the officers are
15   in the front area and the inmates are in the back
16   area?
17        A.    The officer has the ability to go
18   throughout the dorm.  His desk is in the front of
19   the dorm.
20        Q.    Okay.  Is there any policies or rules
21   as to how often the officer should go throughout
22   the dorm?
23        A.    Yes, ma'am.
24        Q.    Okay.  Can you tell me what those are?
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        A.   There's a sign-in book in the back of
 2   the dorm for his tour.  And on a staggered pace;
 3   in other words, you don't go on the hour and on
 4   the half hour, but on a staggered pace throughout
 5   the day within a half an hour you are to sign
 6   that logbook.
 7        Q.   Okay.  Do you know if these logbooks
 8   are -- how long these logbooks are kept in the
 9   custody of the Illinois Department of
10   Corrections?
11        A.   I have no idea, ma'am.  When they fill
12   up, we collect them and we drop them off at
13   somebody's office.
14        Q.   Okay.  Do you know --
15        A.   The retention -- the retention of
16   records --
17             COURT REPORTER:  I'm sorry?
18        A.   Go ahead.
19             COURT REPORTER:  Go ahead.
20   BY MS. WALTERS:
21        Q.   I was asking do you know which office?
22        A.   I don't know whose -- I do not know
23   who's in charge of records retention, ma'am.
24        Q.   Okay, thank you very much.  So there's
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    two floors in J dorm, upper and lower, correct?

2        A.   Correct.

3        Q.   Does J dorm have cells in it?

4        A.   No, ma'am.

5        Q.   Okay.  Can you describe where the

6    space of the inmates is, how the space of the

7    inmates is?

8        A.   Yes, ma'am.  You walk between the two

9    gates.  We call them flags.  And there is a --

10   the way it was then, I don't know how it is now,

11   but the way it was then you had beds down the

12   middle that are butted up against each other, two

13   rows going down the center.  Then you have an

14   aisle and then on the outside walls of the dorm

15   you have a single row of bunks, and all of these

16   are bunks, two inmates to a bunk, you know,

17   they're bunk beds --

18       Q.   Right.

19       A.   -- and it's like a horseshoe

20   walk-around back to the shower and back up to the

21   front of the dorm.

22       Q.   Okay.  So is the shower near the front

23   of the dorm then?

24       A.   Negative.  It's in the back of the

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    dorm.
 2          Q.   Okay.  Is there only one shower?
 3          A.   It is one shower area with multiple
 4    shower heads.
 5          Q.   Okay, that's what I meant.  Thank you.
 6    Is that shower area always accessible to the
 7    inmates?
 8          A.   Yes, ma'am.  There are no doors --
 9    there are no doors on the shower area.
10          Q.   Okay.  When the officer who is on duty
11    at the time is going into his tour to which he
12    signs in, is he expected to review the shower
13    area?
14          A.   He can't help it.  It's open.  It's
15    right next to where the book is kept.
16          Q.   Well, that would make it easier then
17    wouldn't it?
18          A.   Yes, ma'am.
19          Q.   Can you give me a guess as to how many
20    square feet you believe upper J dorm is?
21          A.   No.  I would have to say how many of
22    my houses is it and I could not give you a good
23    estimate of that.
24          Q.   Okay.  Do you know how many bunk beds
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    **are in there?**

2        A.    Upstairs dormitories at the time were

3    usually carrying 88.

4        **Q.    88 bunk bends?**

5        A.    88 -- 88 inmates, so 44 bunks.

6        **Q.    Okay.**

7        A.    What the count of that dorm was on

8    that particular day, I'd have to go find out.

9        **Q.    Okay.  So it's not your testimony that**

10   **there was 88 inmates that day, that's --**

11       A.    No, ma'am.

12       **Q.    -- that's just a general rule?**

13       A.    I have -- and that's -- that's making

14   the assumption that all inmates were in the dorm

15   at the time.

16       **Q.    Okay, thank you for clarifying.  In**

17   **the -- in the upper area of J dorm was there a**

18   **common area for the inmates to spend time**

19   **together?**

20       A.    Yes, ma'am.

21       **Q.    Okay.  Was that -- how close was that**

22   **to the bunk beds?**

23       A.    At the time right at the -- in the

24   middle of it.  I mean, right on top.  The -- as

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1   soon as you leave the front gates to go to the

2   back, you walk through the inmate bathroom which

3   has the inmate sinks, the inmate toilets, and the

4   inmate urinals.  Then you walk into the common

5   area and then from there it was the bunks.

6        Q.   Okay.  Would an officer who was at his

7   desk be able to see the common area from there?

8        A.   No, ma'am.  He would see a piece of

9   it, but he couldn't see the whole thing.

10       Q.   Okay.  What could an officer see from

11  his desk?

12       A.   Depends on where the desk is located

13  up front, but normally in J dorm not much.  A

14  little piece of the bathroom and a little piece

15  of the common area.

16       Q.   Okay.  Major Kinney, can you tell me

17  when you first learned about the incident

18  involving Mr. Moore?

19       A.   That would be when Officer Slagle

20  requested Mr. Moore to be escorted to healthcare.

21       Q.   Do you know what time of day that was?

22       A.   I'm checking the incident reports now.

23  Mr. Slagle wrote his incident report at 3:05.  So

24  I'm fairly certain he called us first and then we

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1   instructed him to write the incident report if he

 2   had an injured inmate.  So sometime between 3:00

 3   and 3:05.

 4        Q.   Were you familiar with Officer Slagle?

 5        A.   I've met Officer Slagle, yes, ma'am.

 6        Q.   Okay.  And did you work with Officer

 7   Slagle frequently?

 8        A.   Ma'am, there are several layers

 9   between my position and Officer Slagle.  I saw

10   him at roll call.

11        Q.   I'm sorry, can you repeat that?

12        A.   I saw him at roll call.

13        Q.   Okay.  So you didn't work with him

14   closely?

15        A.   No, ma'am.

16        Q.   Okay.  Now let's look at the incident

17   report that we're discussing.  I have here an

18   incident report from Officer Gatewood.  I have

19   one from Officer Slagle.  I have one from

20   Ms. Duckwater, and those are the three I'd like

21   to a take quick look at those.  Those for your

22   reference are bate stamped IDOC 4, 5, and 6.

23        A.   Okay.

24        Q.   So first we're looking at Officer
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1    Gatewood.  He's indicating that at 2:50 Mr. Moore
2    is uninjured, correct?
3         A.   That's what his report states, yes,
4    ma'am.
5         Q.   Okay.  Do you know why he drafted this
6    report then?
7         A.   Yes, ma'am.
8         Q.   Can you tell me why?
9         A.   Because it was -- the instruction came
10   out of my office to collect incident reports on
11   an incident.
12        Q.   Okay.  Do you know if there's any
13   other documentation to indicate that Mr. Moore
14   was not injured at 2:50 p.m. besides this
15   incident report?
16        A.   No, ma'am.
17        Q.   You don't know or there's not?
18        A.   I don't -- well, I cannot know a
19   negative, so I don't know if there are any more.
20        Q.   Okay.  So you're unaware?
21        A.   Correct.
22        Q.   And that is your signature at the
23   bottom of the document, correct?
24        A.   I received the incident report, yes,
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1  ma'am.

2        Q.   Okay.  But that's your signature on --

3        A.   Oh, yes, ma'am.

4        Q.   -- document 4?

5        A.   Yes.

6        Q.   Okay, I just wanted to know.  Okay.

7  And then we've got -- moving on we've got IDOC

8  number 5 which is signed by Officer Slagle and

9  he's indicating here that this incident occurred

10  at 3:05.  And at this point would you agree with

11  me, if you have it in front of you, that

12  Mr. Moore had been injured at this time?

13        A.   That's what Mr. Slagle reported, yes,

14  ma'am.

15        Q.   Okay.  Do you have any reason to

16  believe that 3:05 is not the correct time?

17        A.   I don't have any -- I have no evidence

18  to say otherwise, ma'am.

19        Q.   Okay.  Now, Major Kinney, is it your

20  understanding, you know -- strike that.  Major

21  Kinney, to the best of your recollection what

22  shift did Officer Gatewood work?

23        A.   The 7 to 3 shift, ma'am.

24        Q.   Okay.  And was he on upper J dorm that

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1   day?

2          A.   To the best of my knowledge, ma'am,

3   according to his report.

4          Q.   Okay.  And what was the shift that

5   Officer Slagle worked?

6          A.   3 to 11.

7          Q.   Okay.  Did their shift overlap to the

8   best of your knowledge?

9          A.   No, ma'am, they do not.  Officer

10  Slagle arrived at J dorm and relieved Officer

11  Gatewood so Officer Gatewood could go home.

12         Q.   Okay.  Ma'am, to the best of your

13  knowledge after 3:00 did Officer Gatewood leave

14  Vandalia?

15         A.   I have no idea.

16         Q.   Okay.  Do you know if Officer Gatewood

17  completed his -- completed his shift until 3:00?

18         A.   To the best of my knowledge, ma'am.

19         Q.   Okay.  And would he have completed it

20  on upper J dorm or would he have been elsewhere?

21         A.   That I don't have any information for,

22  ma'am.

23         Q.   Okay.  Do you know what documents

24  would inform us of his whereabouts?

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        A.   The roster for that day is where --
 2   probably where my lieutenant went to find out who
 3   the officer that was working that dorm so he knew
 4   who to call to get the incident report.
 5        Q.   Okay.  When you spoke with Officer
 6   Slagle regarding Mr. Moore's injuries, what did
 7   he say to you, do you remember?
 8        A.   I did not talk to Officer Slagle.  I
 9   received his incident report.
10        Q.   That was your first -- I'm sorry, that
11   was your first introduction to this incident?
12        A.   That was the first communication that
13   I had specifically with Officer Slagle was his
14   written report.
15        Q.   When did you receive Officer Slagle's
16   report?
17        A.   According to the report I signed off
18   on his report at 5 p.m.
19        Q.   Okay.
20        A.   No, excuse me, 5:30 p.m.
21        Q.   Okay.
22        A.   Which could -- which could have sat on
23   my desk for any number of hours before I got back
24   to it.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1        Q.   Okay.  So you signed off on 6/14 at
2   5:30 p.m.?
3        A.   On Officer Slagle's incident report,
4   yes, ma'am.
5        Q.   Okay.  And it looks like you signed
6   off on Officer Gatewood's at -- is that 6:00 to
7   you?
8        A.   I think that's 6 p.m., yes, ma'am.
9        Q.   Okay.  And continuing through the
10  document I'm looking at Ms. Duckwater's incident
11  report.  It looks like you also signed off on
12  that at around 5:00 p.m.
13       A.   5:10 is what is written, ma'am?
14       Q.   Is that what it is?
15       A.   Yes, ma'am.
16       Q.   5:10 p.m.?  So would Ms. Duckwater's
17  be the first incident report that you saw?
18       A.   It might have been the first incident
19  report I signed.
20       Q.   Okay.  But not necessarily the first
21  one you saw?
22       A.   Correct.
23       Q.   Okay.
24       A.   Anytime -- I had to fill out the
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1    reportable, ma'am.  To be able to fill out the
2    reportable, I have to collect the documentation.
3         Q.   Okay.  And when you say the
4    reportable, please forgive the fact I'm not as
5    familiar with the language you're using.  The
6    report --
7         A.   It's my notification to the warden.
8              COURT REPORTER:  Wait, wait.
9         A.   I'm sorry.
10             COURT REPORTER:  Go head.
11             MS. WALTERS:  My question was actually
12   going to be sort of directed to you, Lisa.  Do
13   you know which document that is that's bate
14   stamped?  I assume it's been provided to us.
15             MS. COOK:  Yeah, it's 998 to 999.
16             MS. WALTERS:  998 to 999.  Thank you
17   very much.
18   BY MS. WALTERS:
19        Q.   Okay.  So looking again at this
20   document IDOC number 6, it looks like there's a
21   note on the -- on the document itself underneath
22   the narrative that Ms. Duckwater has written and
23   it appears to be initials BDK.
24        A.   Correct.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1          Q.   So are those your initials?

 2          A.   Yes, ma'am.

 3          Q.   And is that your handwriting?

 4          A.   Yes, ma'am.

 5          Q.   Okay.  It says offender sent to FCN at

 6    4:30 p.m.?

 7          A.   That's FCH.

 8          Q.   FCH.  Can you tell me what FCH stands

 9    for?

10          A.   Fayette County Hospital.

11          Q.   Fayette County Hospital.  Okay.  And

12    transferred to St. John's Springfield?

13          A.   That's what it says, yes, ma'am.

14          Q.   Okay.  Then what does that final line

15    say?

16          A.   WDN Luth notified.

17          Q.   Can you tell me what that means?

18          A.   That means I called Warden Luth and

19    told him what happened --

20          Q.   Okay.

21          A.   -- which is my responsibility if an

22    inmate gets sent out to anywhere on my shift.

23          Q.   And what time did you call the warden?

24          A.   Oh, I don't know, ma'am.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        Q.   Okay.  What was the warden's response
2   to your call?
3        A.   To make sure we have all the
4   paperwork.  To the best of my knowledge that's
5   what he asked.  Like I said, this is not an
6   unusual incident.
7        Q.   And when you say make sure you have
8   all the paperwork, what is your understanding of
9   all the paperwork?
10       A.   To collect the incident reports,
11   ma'am.
12       Q.   Just the incident reports?
13       A.   Yes, ma'am.
14       Q.   Okay.  So I have reports from -- once
15   again as we went through Officer Gatewood,
16   Officer Slagle, Ms. Duckworth, I also have
17   another one from an Officer Cornelius?
18       A.   Yes, ma'am.
19       Q.   To the best of your knowledge are
20   those all the incident reports?
21       A.   Yes, ma'am.
22       Q.   Now looking again at Ms. Duckwater's
23   incident report, you see there she indicates, and
24   correct me if I'm wrong, but do you see that she

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    indicates that the plaintiff here was elbowed in

2    the left eye while playing basketball in the gym?

3        A.    That's what the inmate told her yes,

4    ma'am.  She wrote down what she was told by the

5    inmate.

6        Q.    Were you present for that

7    conversation?

8        A.    Of course not.

9        Q.    Okay.  To the best of your knowledge

10   was there another Lamont Moore at Vandalia at the

11   time?

12       A.    I have no idea, ma'am.

13       Q.    After reviewing this incident report,

14   did you look at the gym list?

15       A.    Yes, ma'am.

16       Q.    Okay.  Did you see Mr. Moore's name on

17   the gym list for that day?

18       A.    Hang on.  Let me grab the list.  No,

19   ma'am.

20       Q.    Okay.  Who would be in charge of

21   keeping this gym list?

22       A.    That would be the dorm officer.

23       Q.    And who would that have been that day?

24       A.    To the best of my knowledge it was

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1   Officer Gatewood.
 2        Q.   Okay.  Were you at all familiar with
 3   Mr. Moore?
 4        A.   No, ma'am.
 5        Q.   Now I see that there was an
 6   investigation done after this incident.
 7   Specifically there were, you know, the incident
 8   reports of course but also interviews with other
 9   inmates, are you familiar with those?
10        A.   No, ma'am.
11        Q.   Okay.  Have you ever seen them?
12        A.   No, ma'am.
13        Q.   Those were never given to you?
14        A.   No, ma'am.  That's classified
15   material.
16        Q.   Okay.  Did you ever discuss the
17   incident with any other inmates?
18        A.   No, ma'am.
19        Q.   Major Kinney, do you know what time
20   the pill line runs?
21        A.   Which one?
22        Q.   I guess it would be on the upper J
23   dorm.
24        A.   There's several pill lines throughout
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    the day, ma'am.

2         Q.   Okay.  Do you know the times that they

3    run?

4         A.   I don't -- I don't remember.  There

5    was usually two during day shift, one in the

6    morning and one in the afternoon, and there's

7    usually a pill line I think it was right before

8    evening chow.  So it must run between 3:15 and

9    4:00, somewhere in there, because inmates have to

10   get their insulin before they eat.  And then

11   there's another pill line between 8 and 9:00 at

12   night, but for the day shift pill line I don't

13   have that information, ma'am.

14        Q.   Okay.  Are you familiar with the

15   process of transporting an inmate to -- for

16   medical services?

17        A.   Yes, ma'am.

18        Q.   Okay.  Can you elaborate on it a

19   little bit for me?

20        A.   You're going to have to be more

21   specific with your question.  There's an entire

22   institutional directive that covers

23   transportation of inmates.

24        Q.   That's what I suspected so that's why

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    **I was asking.  I suspected there was quite a few**

2    **procedures and paperwork that needed to be done**

3    **before an inmate could be taken out of the**

4    **institution and to a medical facility.  Can you**

5    **elaborate a little bit on the paperwork that**

6    **would need to be done or the procedures that**

7    **would need to be followed and about how long the**

8    **steps take?**

9        A.   Time wise it can take anywhere from 15

10   minutes to an hour depending on what information

11   needs to be collected from healthcare and in a

12   case on day shift whether or not the record

13   office is open.

14       **Q.   Okay.**

15       A.   I would really have to have the

16   paperwork in front of me, ma'am, to answer your

17   question intelligently --

18       **Q.   Okay.**

19       A.   -- because it is, like you said, it is

20   extensive and it is in order and it comes in a

21   packet and you take the packet out of the drawer.

22   The packets are preput together and you fill out

23   the paperwork in order as they come out of the

24   packet.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        Q.   Okay.  Well, let me ask you this.  It

2   is documented when the -- I saw the medical

3   transfer documents, and we can look at them if

4   you would like, but my question is really

5   general.  When an inmate leaves, it is documented

6   the exact hour and minute that he would leave the

7   institution, correct?

8        A.   Yes, ma'am.

9        Q.   Okay.  And just to be clear, is that

10  or is that not the exact time he is present --

11  his physical body leaves the institution or is

12  that when the documentation for the transport

13  begins?

14       A.   I can't answer that question

15  intelligently.

16       Q.   Okay.

17       A.   I don't think it would be the exact

18  moment that the tires -- that the ambulance --

19  because at this point this was an ambulance

20  transfer.  This was not a --

21       Q.   Right.

22       A.   -- an officer transfer for this inmate

23  so --

24       Q.   Right.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        A.   -- it's handled differently, but I
 2   don't know if the record reflects the time that
 3   the ambulance tires rolled out of the institution
 4   or when the paperwork was filled out.  I don't
 5   know which.
 6        Q.   Okay.  If you were to take a look at
 7   IDOC 1 and we were to look at it --
 8             MS. COOK:  I'm going to hand these to
 9   him.
10        Q.   Take your time.  I don't mean to rush
11   you.
12        A.   Okay.
13        Q.   If you can take a look at the medical
14   furlough for Mr. Moore on June 14th, 2015, I
15   believe it says that he is transferred out of
16   Vandalia at 4:16, is that correct?
17        A.   I'm looking.
18        Q.   Okay, take your time.
19        A.   That would be 6/14/2015.  It says
20   1616, yes, ma'am.
21        Q.   Okay.  So that's 4:16 p.m., correct?
22        A.   Correct.
23        Q.   Okay.  And again I don't mean to
24   belabor the issue, but to the best of your
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    knowledge is that when he leaves the institution?
 2         A.   That's what time that the record was
 3    created, ma'am.
 4         Q.   Okay.  Do you know who creates the
 5    record?
 6         A.   At the time they had to take him off
 7    of count, so that would have been armory
 8    personnel.
 9         Q.   Armory personnel?
10         A.   Yes, ma'am.
11         Q.   So is it too much to ask do you know
12    who was in armory personnel?
13         A.   Way too much to ask.  I have slept a
14    couple of times since then and I have definitely
15    had a beer.
16         Q.   Okay, not a problem.  I didn't think
17    that was very likely.  Okay.
18         A.   And the armory personnel was ordered
19    to take him off count and for what reason, and he
20    has to generate that record, or she.
21         Q.   Who orders the armory personnel to
22    take him off of count?
23         A.   It comes out of my office, ma'am.  It
24    was either me or the desk lieutenant at the time.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        Q.    Do you remember -- do you recall
 2   whether it was you who spoke with the armory --
 3        A.    It was probably --
 4              COURT REPORTER:  Sorry, wait.  Can you
 5   say that again?
 6   BY MS. WALTERS:
 7        Q.    Do you recall whether it was you
 8   personally or somebody else within your office
 9   that spoke with the armory personnel that day?
10        A.    I do not recall.
11        Q.    Okay.  Would that be recorded
12   somewhere?
13        A.    No, ma'am.
14        Q.    Okay.  Major Kinney, did you ever have
15   any conversation with Officer Slagle about this
16   incident?
17        A.    Not to my recollection.
18        Q.    Did you have any conversations with
19   Officer Gatewood about this incident?
20        A.    Not to my recollection.
21        Q.    Did you have any conversations with
22   Officer Cornelius about this incident?
23        A.    Yes, ma'am.
24        Q.    Can you elaborate on the conversation?
```

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        A.    As the incident report is reflective,
 2   that was accepted by Major Waltz on the midnight
 3   shift.
 4        Q.    Before you proceed, I'm sorry, can you
 5   tell me just exactly and by that, I mean, refer
 6   to the bate stamp of the document you're talking
 7   about.
 8        A.    Number 7.
 9        Q.    Thank you.  Please proceed.
10        A.    The report reads that he -- that
11   Officer Cornelius received a call from me and I
12   needed -- I asked him or instructed him to ask
13   Mr. Moore if the person that had -- that he had
14   an altercation with was Inmate Sample.
15        Q.    Uh-huh.  How did you know to ask about
16   Inmate Sample?
17        A.    Because any time that -- the nurse
18   reported -- any time a nurse reports to you that
19   it looks as if an inmate has been assaulted, you
20   know, we have to find out what happened.  And
21   specifically if a weapon was used and the nurse
22   was correct a weapon was used.  And we have to
23   make sure that that is -- that we don't have any
24   more problems in the dormitory.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1          Q.    Of course.

2          A.    And the information that was coming in

3    that I was getting, because inmates tell on each

4    other very rapidly --

5          Q.    Uh-huh.

6          A.    -- and we had a pretty good idea at

7    the time, nothing to nail to a tree, but a pretty

8    good idea at the time what had happened and who

9    had done it.  And I needed confirmation from

10   Inmate Moore so I could eliminate the possibility

11   of anything like retaliation happening in the

12   dormitory.  I had to remove the problem.

13         Q.    Okay.  So let me just sort of

14   reiterate my understanding of what you just told

15   me.  That essentially a nurse acknowledged that

16   there had been some type of weapon used?

17         A.    Yes, ma'am.

18         Q.    Okay.  And she brought that to your

19   attention?

20         A.    Yes, ma'am.

21         Q.    And what nurse was this?

22         A.    The only nurse that was on shift that

23   night.  I think it was the one I got the incident

24   report from.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
1          Q.   Would that be Duckwater?

2          A.   I think so, ma'am.

3          Q.   Okay.

4          A.   I don't know if there was one nurse or

5     two nurses on that night.

6          Q.   Okay.  And did you speak with her

7     directly or just read her incident report?

8          A.   It's not in her incident report that

9     there was a weapon used, so I must have called

10    her on the telephone.

11         Q.   Okay.  And how did you conclude or

12    perhaps someone else conclude and tell you that

13    it was Mr. Sample who was involved in this

14    incident?

15         A.   Reports we were getting from other

16    inmates in the dorm.  I really -- again I do not

17    remember this incident.  I can only --

18         Q.   That's fine.

19         A.   -- suppose based on logic and common

20    sense and the years that, you know, I spent there

21    on how information is acquired.  I didn't know if

22    we had had an assault, if we had a -- if we just

23    had a fight or if I had an inmate that got stuck

24    in the eye at the gym at the time.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1        Q.   Okay.

 2        A.   So I collected information and made a

 3   decision.

 4        Q.   Okay.  And when you collected this

 5   information, were they handwritten notes from

 6   inmates?

 7        A.   I have seen some of these handwritten

 8   notes from -- but I don't remember if I got these

 9   or if they came in later.  I can make the

10   assumption that I -- I got to see them --

11        Q.   Okay.

12        A.   -- but again it's an assumption.

13        Q.   Okay.  Let's talk about Mr. Sample for

14   a minute.  Are you familiar with him?

15        A.   No, ma'am.

16        Q.   Are you familiar with any of -- strike

17   that.  Do you recall whether after this incident

18   you looked at Mr. Sample's disciplinary history?

19        A.   Not my job.

20        Q.   Okay.  Do you know if anyone else did?

21        A.   I'm sure when the investigation was

22   done somebody looked at it.

23        Q.   Do you know -- do you know by chance

24   who would have been in charge of that?
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        A.    No, ma'am, I do not.

2        Q.    **And you said you don't recall whether**

3   **you had a telephone conversation or in-person**

4   **conversation with Ms. Duckworth?**

5        A.    I do not recall.

6        Q.    **Okay.  Major Kinney, do you know**

7   **whether the key that was used in the attack on**

8   **Mr. Moore was ever recovered?**

9        A.    I have no direct knowledge of that,

10  ma'am.

11       Q.    **Do you know what time this occurred in**

12  **the day?**

13       A.    No, ma'am, I do not.

14       Q.    **Did you have any chance to see**

15  **Mr. Moore after the attack?**

16       A.    Not to my recollection, ma'am.

17       Q.    **Have you ever spoken with Mr. Moore?**

18       A.    The possibility is there, but not that

19  I remember.

20       Q.    **Okay.  Do you recall what he looks**

21  **like at all?**

22       A.    Only from the pictures --

23       Q.    **Okay.**

24       A.    -- but it doesn't ring a bell that I

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    would know this man.
 2         Q.   Okay.  Well, that just kind of goes
 3    into my next question.  Do you have any recall
 4    having any sort of interaction with Kaleel
 5    Sample?
 6         A.   No, ma'am.
 7         Q.   Okay.  And by that, do you mean you
 8    don't have any recollection or you don't believe
 9    you ever did?
10         A.   At the time there was 1,700 inmates in
11    Vandalia.
12         Q.   I understand.  I'm certainly not --
13         A.   Couldn't pick him out of a crowd.
14    Could not pick him out of a crowd.  And I do not
15    remember if I had any contact with him.
16         Q.   Okay.  Major Kinney, are you familiar
17    with any previous occurrence similar to this
18    where an inmate has been attacked with a key?
19         A.   Not that I recollect.
20         Q.   And how long has the inmates been
21    receiving -- strike that.  To the best of your
22    recollection have the inmates always had a
23    property key on them?
24         A.   Since the day I started, yes, ma'am.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        Q.    Okay.  Would you say there's pretty
2    regular inmate-on-inmate violence?
3        A.    It's not abnormal.
4        Q.    Major Kinney, do you have any
5    knowledge of Officer Gatewood being told about
6    Inmate Sample being dangerous prior to the
7    incident?
8        A.    No, ma'am, I do not.
9        Q.    Were you ever -- was that ever brought
10   to your attention that somebody might have told
11   Officer Gatewood that Inmate Sample was
12   dangerous?
13       A.    No, ma'am, I do not.
14       Q.    Are you aware of any inmate telling
15   any correctional officer about a danger potential
16   from Inmate Sample?
17       A.    No, ma'am, I'm not aware of that.
18       Q.    These handwritten notes from inmates,
19   did they all come after the incident?
20       A.    To the best of my knowledge, yes,
21   ma'am.
22       Q.    Major Kinney, are you -- strike that.
23   Major Kinney, to the best of your knowledge do --
24   do the inmates on upper J dorm frequently have

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    gang affiliations?

 2         A.   Yes, ma'am.

 3         Q.   Is there any action taken to prevent

 4    rival gang members from being within close

 5    proximity to each other?

 6         A.   That would be an impossible situation,

 7    ma'am, to keep rival gang members separate from

 8    each other.

 9         Q.   Okay.

10         A.   It's an open dormitory.

11         Q.   Okay.  Is that how all of Vandalia is,

12    an open dormitory?

13         A.   Unless you're locked up in

14    segregation, yes, ma'am.

15         Q.   Mr. Moore received segregation after

16    this incident did he not?

17         A.   I have no information one way or the

18    other.  He did not come back to Vandalia after he

19    left in the ambulance.

20         Q.   Okay, perhaps I'm misreading something

21    then.  Can you take a look at IDOC 1, please?

22         A.   Okay.

23         Q.   Can you take a look at the date

24    6/17/2015?
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1         A.   Well, I was in error then, ma'am.  I
2    was not aware that he returned.
3         Q.   Okay.  I'm just making sure I'm
4    reading it correctly.
5         A.   Okay.
6         Q.   I'm not trying to catch you off guard
7    or anything.  So he did come back to Vandalia on
8    the 17th?
9         A.   According to the paperwork, yes,
10   ma'am.
11        Q.   Are you aware whether he was put into
12   segregation after that?
13        A.   No, ma'am, I'm not.
14        Q.   Okay.  Do you have any knowledge as to
15   where Mr. Moore was housed after he returned to
16   Vandalia?
17        A.   No, ma'am, I do not.
18        Q.   Do you have any further knowledge
19   about Mr. Moore after the incident?
20        A.   No, ma'am.
21        Q.   Do you have any knowledge about
22   Mr. Moore prior to the incident?
23        A.   Not that I recollect, no, ma'am.
24        Q.   Okay.  Major Kinney, just be patient

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    with me.  I'm just sort of reviewing my notes.

2    I'm just seeing if I can wrap this up.  Major

3    Kinney, can you do me a favor and take a look at

4    IDOC 4?

5         A.   Okay.

6         Q.   At the end of the narrative written by

7    Officer Gatewood there's what appear to be

8    initials EOR --

9         A.   Yes, ma'am.

10        Q.   -- do you see that?

11        A.   Yes, ma'am.

12        Q.   Do you know what that means?

13        A.   Yes, ma'am.

14        Q.   What does that mean?

15        A.   End of report.

16        Q.   Okay.  Well, that's pretty -- give me

17   a second.  Do you know who the chief

18   administrative officer was at the time?

19        A.   That would have been Warden Luth,

20   ma'am.

21        Q.   Okay.  If you could take a look at the

22   IDOC -- bate stamp IDOC 8 through 10, let me know

23   when you have that in front of you.

24        A.   Okay.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1          Q.    Thank you.  Can you tell me what these
 2   are?
 3          A.    They look like copies of what we call
 4   inmate kites.
 5          Q.    And what does kite stand for?
 6          A.    It doesn't stand for anything.  It
 7   just means an inmate wrote a note and handed it
 8   to an officer.
 9          Q.    Okay.
10          A.    Just a form of communication that --
11   usually anonymous.
12          Q.    Okay.  Have you seen these previously?
13          A.    Previous to today, yes, ma'am.
14          Q.    Okay.  When did you see them?
15          A.    When I requested the paperwork to
16   refresh my memory about this incident.
17          Q.    Okay.  Was that the first time that
18   you saw them?
19          A.    I have no recollection, ma'am, if it
20   was or not.
21          Q.    Okay.  Can you take a look at IDOC 13,
22   please?
23                MS. COOK:  Give us one second.
24                MS. WALTERS:  Uh-huh, take your time.
```

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1              MS. COOK:  I think we're out of order.
 2    Here you go.
 3         A.    Okay.
 4         Q.    Just a quick explanation.  Can you
 5    take a look at the date the incident -- this is
 6    Officer -- for the record this is Officer
 7    Gatewood's employee time sheet for 2015.  And I'd
 8    like you to take a look at the date of June 15 --
 9    I'm sorry, June 14th, do you see the sort of
10    determining box?
11         A.    Yes, ma'am.
12         Q.    I believe it has the letters RC in
13    there?
14         A.    Yes, ma'am.
15         Q.    What does RC stand for?
16         A.    Roll call.
17         Q.    Okay.  Does that box indicate anything
18    else as to where -- what shift Mr. -- I'm sorry,
19    Officer Gatewood would be working or where?
20         A.    Just his shift, ma'am.  It was 7 to 3.
21         Q.    Okay.  But does this document
22    anywhere, perhaps I haven't seen it, indicate
23    where he would be working that day?
24         A.    No, ma'am.
```

Page 53

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1          Q.    Okay.  Does it indicate whether he
2    would be working a second shift that day?
3          A.    I'm checking for overtime, ma'am.
4          Q.    Yes.
5          A.    I don't think so, ma'am.
6          Q.    Okay.
7          A.    The roll call sheets from that day
8    would give that information for both shifts.
9          Q.    The roll call sheet?
10          A.    The roll call sheet would give you
11    when he worked and where he worked.
12          Q.    Okay.
13          MS. COOK:  I'm sorry, Major Kinney,
14    what did you say?
15          A.    There's no OT listed for that day on
16    the time sheet because this is just a time sheet
17    and this is filled out, you know, by the time
18    sheet coordinator.
19          Q.    Okay.
20          A.    And jeez, I haven't seen one of these
21    in a long time.  But roll call is listed.  There
22    was no holiday time listed.  There was no OT
23    listed.  No paid holiday listed.  The only thing
24    that was listed was roll call.  So it looks as if

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

 1    he only worked his one eight-hour shift, ma'am.

 2         Q.   Okay.  To the best of your knowledge,

 3    Major Kinney, is it frequent that an officer --

 4    let me strike that and rephrase it.  To the best

 5    of your knowledge, Major Kinney, is a

 6    correctional officer expected to stay in the

 7    dormitory where he is assigned until the end of

 8    his shift?

 9         A.   Yes, ma'am.

10         Q.   Okay.

11         A.   Unless he is relieved.

12         Q.   Okay.  So if another officer were to

13    come on prior to the end of the shift, then that

14    officer -- the first officer could leave the

15    dormitory or is he expected to stay until the end

16    of that shift?

17         A.   He's expected to go where his shift

18    supervisor tells him to go.  Any officer at any

19    time can be relieved off of any post, ma'am.  I

20    mean, they get relieved at least once a day to go

21    eat.

22         Q.   Understandable.  If I were to look at

23    the roll call sheets, would I be able to

24    ascertain whether Officer Gatewood was in upper J

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    dorm until 3:00 in the afternoon that day?

2        A.    No, ma'am, not from the roll call

3    sheet.

4        Q.    Okay.  How would I be able to

5    ascertain where Officer Gatewood was until 3:00

6    that day?

7        A.    2:00 count sheet.

8        Q.    What is that exactly?

9        A.    That is his record of his 2:00 count.

10        Q.    Okay.

11        A.    It is signed by him and another

12    officer.

13        Q.    Okay.  Are there usually two officers

14    assigned to upper J dorm?

15        A.    No, ma'am.

16        Q.    Okay.  When you say signed by another

17    officer, where does that officer come from?

18        A.    All count sheets require two

19    signatures.

20        Q.    Okay.  So if there's only one officer

21    up there, and let's just -- assuming

22    hypothetically using Officer Gatwood -- Gatewood,

23    excuse me, if Officer Gatewood does his 2:00

24    count sheet and he signs it, where does the other

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1   officer that sign it come in?  Do they sign it

2   right then or do they sign it later?

3        A.   No, they sign it at the time that they

4   count the dorm, ma'am.

5        Q.   Okay.

6        A.   Officers are assigned to that job.

7        Q.   The officer is assigned to do that

8   job, is that what you said?

9        A.   If you pull the 2:00 count sheet,

10  ma'am, if you request that document, it will tell

11  you who counted that dorm at 2:00.

12       Q.   Okay.  All right.  Let's take a look

13  at your reportable, Major Kinney, which I believe

14  is IDOC number 998.

15       A.   Yes, ma'am.

16       Q.   Okay.  And this was sent to Robert

17  Osborne, is he the warden?

18       A.   No, ma'am, he -- I -- to the best of

19  my recollection -- recollection he was the

20  internal affairs officer at the time, the

21  internal affairs lieutenant, but my report was

22  sent to the warden.

23       Q.   Okay.

24       A.   It also went to the DL operations

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

 1   center, which it's required to go, and all the

 2   cc's underneath that any time that an inmate

 3   leaves the institution.

 4        Q.   Okay.  And essentially what you're

 5   explaining to all these recipients here is that

 6   on 6/17 Mr. Moore returned to Vandalia, correct?

 7        A.   No, ma'am.  The date was 6/14 of my

 8   reportable.

 9             MS. COOK:  Yeah, Kellie, I think -- so

10   the reportable part is the June 14th e-mail and

11   then there's just a follow-up.

12             MS. WALTERS:  Oh, yeah, I was going to

13   get down to that.  I'm sorry.  We can go back to

14   June 14th.  That's fine.

15        Q.   So essentially you indicate that on

16   the 14th at approximately 4:30 Mr. Moore was sent

17   to Fayette County, correct?

18        A.   Correct.

19        Q.   Okay.  And then he was then sent to

20   Memorial Medical?

21        A.   That's what the report states, yes,

22   ma'am.

23        Q.   To the best of your knowledge I know

24   Mr. -- Officer Cornelius did an incident report.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    **To the best of your knowledge did Officer**

2    **Brumfield make a report.**

3         A.    Not to my knowledge, ma'am.

4         **Q.    Did you speak to Officer Brumfield**

5    **that day?**

6         A.    Not to my knowledge, ma'am.

7         **Q.    And then just to clarify, your report**

8    **goes on to indicate at 6/17 that he returned**

9    **around 8:00, correct?**

10        A.    Yes, ma'am.

11        **Q.    And it says thanks to Jacksonville CC**

12   **for the coverage, what does that refer to?**

13        A.    When an inmate has a hospital stay,

14   ma'am, an officer has to be assigned to that

15   inmate.  Because of the proximity of the

16   Jacksonville Correctional Center to the hospital

17   where Mr. Moore was, they provided the security

18   for Mr. Moore.

19        **Q.    Okay.**

20        A.    I was just thanking Jacksonville for

21   their help.

22        **Q.    Okay.  All right, Major Kinney, I'm**

23   **going to ask you to take a look at IDOC 1048.**

24             MS. COOK:  One second.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1              MS. WALTERS:  Uh-huh.
 2              MS. COOK:  Here's 1048.
 3         A.   Yes, ma'am.
 4         Q.   Okay.  And is that your signature on
 5    this document?
 6         A.   Yes, ma'am.
 7         Q.   Okay.  And can you tell me what this
 8    is exactly?
 9         A.   Hang on a second.  Let me read it.
10         Q.   Yeah, absolutely.
11         A.   Yes, ma'am.  It's a disciplinary
12    report written by Officer Shawn Ritchey stating
13    that because of Inmate Moore's admission to being
14    in a physical altercation with Inmate Sample,
15    that he was placing him in segregation.
16         Q.   Okay.  And you signed off on this?
17         A.   Yes, ma'am.
18         Q.   So would it be true then that when
19    Mr. Moore returned to Vandalia, he was put in
20    segregation?
21         A.   Not immediately, ma'am.  This is dated
22    the 18th -- or actually this is dated the 22nd.
23         Q.   Okay.
24         A.   So he was probably -- and normally
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1   when an inmate comes back from an outside

2   hospital, they spend the next few days in our

3   healthcare --

4          Q.   Okay.

5          A.   -- but I don't know that for certain.

6          Q.   Major Kinney, can you explain to me

7   which document -- and I realize we're looking at

8   a lot of documents here today.  Can you point out

9   which document and where it's indicated that

10  Mr. Moore admitted to being in a physical

11  altercation with Inmate Sample?

12         A.   I don't have access to the interviews,

13  ma'am.

14         Q.   Okay.  Did you read the interviews

15  prior to signing this document?

16         A.   No, ma'am.

17         Q.   Okay.  Is it your understanding that

18  Officer Ritchey is referring to his personal

19  interview with Inmate Moore?

20         A.   That is my understanding of the

21  document, yes, ma'am.

22         Q.   Major Kinney, I'm going to ask you to

23  hold for a period of a minute for two reasons:

24  Number 1, I have to use the bathroom, and

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    number 2, I'm just going to review a few of my
 2    notes and wrap up my questions prettily quickly
 3    here.  Do you need to take a break or anything?
 4         A.   No, ma'am.
 5         Q.   Give me one second.
 6              (A recess was taken from 10:12 a.m. to
 7              10:16 a.m.)
 8         Q.   One last question I believe I have
 9    for, Major Kinney, and that is in the instance
10    where a correctional officer is given information
11    about an impending attack or assault or fight
12    similar but not exactly the situation to the
13    notes that were tasked from the inmate as is
14    reflected in IDOC -- bate stamped IDOC 8 through
15    10.  What is a correctional officer expected to
16    do when he receives a warning such as this?
17         A.   Pass them on to his supervisor.
18         Q.   Okay.  And would you have been that
19    supervisor in this instance?
20         A.   I was the shift supervisor at the
21    time.  They could have come through several hands
22    before they got to me.  They could have gone
23    through a sergeant's hand.  They could have, you
24    know, to a lieutenant's hands and then to my desk
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

 1    or two lieutenant's hand.  We have a south end

 2    lieutenant and north end lieutenant.  It's just,

 3    you know, they were collected.

 4        Q.    Okay.  So let's just in the -- in a

 5    situation that, let's say, a correctional officer

 6    is told that there's problems between two inmates

 7    and they're likely to get into an altercation

 8    later, what, if anything, is he expected to do?

 9        A.    He would spend his entire day doing

10    that.

11        Q.    What do you mean by doing that?

12        A.    Inmates -- it's a common complaint

13    that inmates are going to have problems.  That's

14    why the officer is in the dorm.  He hears it

15    continuously.  Credible threats or anything that

16    is impending we put officers in dorms because

17    they use their judgment to run their dormitory.

18    Anything credible that comes about is pulled out,

19    turned over to either intel or internal affairs

20    and if found to be a credible report, then the

21    inmates are put on KSF status, which stands for

22    keep separate from, and it goes into the computer

23    and that follows that inmate from institution to

24    institution.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1      Q.   How does one make a determination as
2  to whether a report is credible?
3      A.   You interview the inmates.
4      Q.   I mean, it sounds like this is a very
5  important role of the correctional officer's job?
6      A.   The correctional officer does not put
7  inmates on KSF status.  That's handled at a
8  higher pay grade.
9      Q.   No, no.  What I meant is making the --
10  receiving the warning and making the assessment
11  as to the credibility.
12      A.   Yes, ma'am, that's why he's in the
13  dorm.
14      Q.   Okay.  And so the interviews of the
15  inmates would be probably pretty frequent would
16  you say?
17      A.   Not pretty frequent.
18      Q.   No.  But the -- is it -- the way one
19  determines that a report is credible is by
20  interviewing an inmate, correct?
21      A.   Correct.  To go on a KSF status.
22      Q.   Okay.  When one receives a report in
23  general -- okay.  Let me just ask you this.  Let
24  me back up a second.  When would a correctional

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1    officer in your estimation make the decision
 2    whether or not to interview an inmate after
 3    receiving a report such as this?
 4         A.   You mean to recommend the inmate for
 5    interview?
 6         Q.   Oh, sure, yes.
 7         A.   That would be the judgment of the
 8    correctional officer.  I can only answer for me.
 9    I can't answer for the judgment of another
10    officer.
11         Q.   Of course, and I wouldn't expect you
12    to.  So the correctional officer himself does not
13    interview the inmate, he recommends the interview
14    for it?
15         A.   Correct.
16         Q.   Okay.  And who upon recommendation
17    actually interviews that inmate?
18         A.   That would either be handled by
19    internal affairs or the intel officers.
20         Q.   Okay.  And if a correctional officer
21    were to receive a report that there was an
22    altercation within like the next hour from the
23    time he received the report, what would generally
24    be his -- do you think would be the appropriate
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    action to take?

2         A.   To report it up the chain, ma'am.

3         Q.   **If the altercation were to take place**

4    **in the next hour?**

5         A.   If an officer receives a report that

6    there's going to be a fight in his dormitory,

7    whether it's in the next hour, the next minute or

8    the next week, he's required to report that up

9    the chain.

10        Q.   **Okay.  Major Kinney, I think that's**

11   **all I have.**

12             MS. WALTERS:  Lisa, did you have any

13   follow-ups?

14             MS. COOK:  Yeah, I have a couple

15   follow-up questions.

16                  CROSS-EXAMINATION

17   BY MS. COOK:

18        Q.   **And so, Mr. Kinney, just so it's**

19   **clear, you have in front of you number 1048?**

20        A.   Yes, ma'am.

21        Q.   **And that -- what is that?**

22        A.   That looks like a disciplinary report

23   to place Inmate Moore in segregation based on an

24   interview from Officer Ritchey.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

 1          Q.    Where did you sign the report?

 2          A.    In the shift review box.

 3          Q.    And what does the shift review entail?

 4          A.    I make sure that the report is filled

 5     out correctly and that given the nature of the

 6     offense whether or not the individual should be

 7     locked up in segregation.

 8          Q.    And so you don't actually have any

 9     personal knowledge of the report or what the

10     report states, is that correct?

11          A.    I don't understand the question.

12          Q.    You didn't write the report, it was

13     written by another officer, correct?

14          A.    Yes, ma'am.

15          Q.    And do you have to have knowledge of

16     what the officer found before you sign off the

17     shift review?

18          A.    No, ma'am.

19          Q.    And after you signed the shift review

20     area, what -- what happens next with the form?

21          A.    It is countersigned by another command

22     staff, which at this point was Lieutenant Morgan,

23     and then the inmate is transported to the

24     segregation unit and placed there.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        Q.   So after you would have signed this
2   document, you would have forwarded it on to the
3   next layer of review?
4        A.   At this particular incident on this
5   document I handed it to the lieutenant in the
6   office.
7        Q.   You were also asked some questions
8   about an incident report written by Adam
9   Cornelius?
10       A.   Yes, ma'am.
11       Q.   And I'm sorry, that's bates number 7.
12   Does that report conform with what you remember?
13   Does it -- what Mr. Cornelius wrote in the report
14   make sense to you?
15       A.   Yes, ma'am, it makes sense to me.
16       Q.   And do you disagree with anything
17   that's in this report by Mr. Cornelius?
18       A.   No, ma'am.
19       Q.   You also talked just generally about
20   some just shift-related things and to somebody
21   who is reading this it might not be clear so I
22   just want to clarify some of that with you.  So
23   if somebody works the day shift, what time is
24   their shift?

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1          A.   It's a 7 to 3 shift.  Roll call starts
 2     at 6:45 and they're usually relieved between 2:45
 3     and 3:00.
 4          Q.   So the shift itself is from 7 a.m. to
 5     3 p.m.?
 6          A.   Correct.
 7          Q.   But they're required to come early
 8     before 7 a.m. to begin their shift?
 9          A.   Yes, ma'am.
10          Q.   And so you mentioned that they have
11     breaks to eat, correct?
12          A.   Yes, ma'am.
13          Q.   Are officers entitled to other breaks
14     during their shift?
15          A.   No, ma'am.
16          Q.   Now for the 3 p.m. shift that you
17     worked, what time would roll call be for that
18     shift?
19          A.   2:45.
20          Q.   So all the officer would -- for that
21     shift would have to be there by 2:45, is that
22     correct?
23          A.   That's correct.
24          Q.   And then after -- well, what happens
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    during roll call?

2         A.   We read any information that has to be

3    passed on from shift to shift.  We read any

4    notices that are coming from command staff or the

5    warden's office.  Any points of interest has to

6    be covered that's happened in the last 24 hours

7    any updates and then we take roll call.

8         Q.   And then what happens after that?

9         A.   They go to work.

10        Q.   So it could be before 3 p.m. that

11   somebody gets to their assignment?

12        A.   That is correct.

13        Q.   And you discussed a 2:00 count and the

14   2:00 count sheet, what is a 2:00 count?

15        A.   2:00 count is a scheduled count on day

16   shift to make sure that all of the inmates are --

17   that are supposed to be in the dormitory are in

18   the dormitory and the ones that are accounted for

19   where they are.  So when the officer on the --

20   the 3:00 officer comes in, he matches that 2:00

21   count to the count that he takes.

22        Q.   And so for 2:00 count, are there two

23   officers who perform that count?

24        A.   Yes, ma'am.

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        Q.    And how do they do it, do you

2   remember?

3        A.    Sure.  They have everybody stand up.

4   They walk around the dorm and they count them one

5   at a time.

6        Q.    Do they each count and meet in the

7   middle or do they each perform an individual

8   count?

9        A.    They each perform an individual count.

10       Q.    Of every single inmate?

11       A.    Yes, ma'am.

12       Q.    And so Mr. Slagle's report, his

13  incident report, mentions that he cleared count

14  when he came onto his shift?

15       A.    Yes, ma'am.

16       Q.    What does cleared count mean?

17       A.    It means that the count that was given

18  to him by the 3 -- or the 7 to 3 officer matched

19  the count that he came up with that he counted.

20       Q.    So when Officer Slagle or somebody on

21  the 3 to 11 shift comes on, they come back and

22  they count every single inmate?

23       A.    Yes, ma'am.

24       Q.    Okay.  And the kite documents that we

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1    looked at, the inmate kites, do you believe that
2    those came before or after Mr. Moore's injury?
3         A.   After, ma'am.
4              MS. WALTERS:  I'm sorry, can you
5    repeat your question?  I didn't hear it.
6              MS. COOK:  I asked him if the inmates'
7    kites that he received through -- they're bates
8    numbered 8, 9, and 10, if those came through
9    before or after Mr. Moore's injury to his
10   knowledge.
11             MR. WALTERS:  And what was your
12   answer?
13        A.   After.
14             MR. WALTERS:  Okay, thank you.
15             MS. COOK:  Those are all the questions
16   I have.
17                  REDIRECT EXAMINATION
18   BY MS. WALTERS:
19        Q.   I just have a couple more questions.
20   Looking at the incident report of Officer
21   Cornelius, which I believe is IDOC 7, were you
22   present for the discussion between Officer
23   Cornelius and Inmate Moore?
24        A.   No, ma'am.

Keefe Reporting Company

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1          Q.   Okay.  But you say you don't disagree
 2    with it?
 3          A.   No, ma'am.
 4          Q.   Okay.  How could you disagree with it?
 5          A.   I took the report as written, ma'am.
 6          Q.   Okay.  And also looking at IDOC 1048
 7    again, you did say earlier that -- you did say
 8    earlier that prior to signing this you did not
 9    review the interview that Officer Ritchey had
10    with Mr. Moore?
11          A.   That's correct.
12          Q.   Okay.  To the best of your knowledge
13    does the lieutenant look at the interview that is
14    conducted amongst the reporting officer and the
15    inmate?
16          A.   No, ma'am.  Anything that's handled by
17    internal affairs or by intel is classified
18    material.
19          Q.   Okay, one last question.  Kite, that
20    comes through inmates regarding the safety or,
21    you know, for potential danger of another inmate,
22    what's generally done with those after they're
23    received?
24          A.   Depends on what's in them.
```

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

1        Q.    Okay.  At any time do these kites end
2   up in perhaps the case file of the inmate that
3   it's referencing?
4        A.    Depends on what's in them.
5        Q.    Okay.  Let me ask you this.  What
6   circumstances would a kite or at least a report
7   of a kite end up in the case file of a referenced
8   inmate?
9        A.    If it becomes material to an
10  investigation or to an incident.
11             MS. WALTERS:  I believe that's all I
12  have.
13             MS. COOK:  Okay, we're done.  He will
14  waive signature.
15                  SIGNATURE WAIVED
16
17
18
19
20
21
22
23
24

Lamont Moore v. Western Illinois Correctional Center, et al.
Major Brian Kinney 4/16/2019

```
 1                          CERTIFICATE

 2

 3          I, Beverly S. Hopkins, a Certified

 4     Shorthand Reporter in the State of Illinois,

 5     Certified Court Reporter in the State of

 6     Missouri, and Registered Professional Reporter,

 7     DO HEREBY CERTIFY that pursuant to agreement

 8     between counsel there appeared before me on

 9     April 16, 2019, at the Vandalia Correctional

10     Center, Highway 51, Vandalia, Illinois, MAJOR

11     BRIAN KINNEY, who was first duly sworn by me to

12     tell the whole truth of all knowledge touching

13     upon the matter in controversy aforesaid so far

14     as the witness should be interrogated concerning

15     the same; that the witness was examined and said

16     examination was taken down in shorthand by me and

17     afterwards transcribed, signature having been

18     waived by agreement of counsel, and said

19     deposition is herewith returned.

20          Dated this 29th day of September, 2019.

21

        _____
22           Beverly S. Hopkins, CSR, CCR, RPR
             Illinois CSR License #084-004316
23                     MO CCR #968

24
```