## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| LAMONT MOORE,          ) | |
|                            ) | |
|       Plaintiff,       ) | |
|                            ) | |
| v.                        ) | Case No. 16-CV-3289 |
|                            ) | |
| WESTERN ILLINOIS   ) | |
| CORRECTIONAL CENTER,  ) | |
| *et al.*,                  ) | |
|                            ) | |
|       Defendants.   ) | |

## <u>ORDER GRANTING SUMMARY JUDGMENT</u>

Tragically, Plaintiff lost an eye when he was attacked by an inmate in Vandalia Correctional Center on June 14, 2015.  This lawsuit arises from that attack and subsequent alleged indifference to Plaintiff's need for medical care and accommodation.  Plaintiff's counsel has recently filed a notice of Plaintiff's death and intent to file a timely motion to substitute the representative of Plaintiff's estate.

Defendants move for summary judgment, which is granted on the federal claims.  A rational juror could not conclude that the only individual defendant sued, Officer Gatewood, was aware of a substantial risk of serious harm to Plaintiff before the attack or was

indifferent to Plaintiff's injury after the attack. Plaintiff's claim under the ADA does not survive summary judgment because a rational juror could not find that Plaintiff was substantially limited in his ability to walk. The Court relinquishes supplemental jurisdiction over Plaintiff's state law claims.

## I.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a genuine dispute through specific cites to admissible evidence or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(1). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.*; *Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient

evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.* at 248.

## II.   FACTS

In June 2015, Plaintiff was an inmate incarcerated at Vandalia C.C. and housed in J Dorm with another inmate, Kaleel Sample ("Sample"). (Pl. Dep. ECF 55-1 9:24-10:4, 10:11-14). The dorm was an open dorm setting, open like a large pole barn. (Gatewood Dep. ECF 55-2 15:8-9). There were approximately 40-44 bunk beds lined up in rows, and there was a shower room in the back and restroom. (*Id.* at 15:11-19). There may have been around 86 inmates housed in J Dorm in June 2015. (*Id.* at 16:19-21). Inmates were allowed to have keys for the lockboxes under their bunks. (*Id.* at  55-2 17:6-10; Maj. Brian Kinney Dep. ECF 63-2 47:21-24).

Defendant Jason Gatewood was the regular dorm officer in J Dorm at the time. (Gatewood Dep. ECF 55-2 11:20-12:17, 17:8-10).

From the place where a correctional officer sat in the front of the dorm, they would be able to see the majority of the dorm except for the bathrooms and shower area. (Shawn Ritchey Dep. ECF 63-8 29:16-24). Correctional officers are trained to be alert and make determinations as whether there will be violence among the inmates (Ritchey Dep. 63-10 43:14–44:11). It is mandatory that a correctional officer tour the dorm to which he is assigned every half-hour (Ritchey Dep. ECF 63-10 30:3-4). Because J Dorm is an open dormitory, it would be impossible to keep rival inmates separate from each other, unless one was locked up in segregation. (Kinney Dep. ECF 63-2 49:6-14).

Around June 11, 2015, Sample was playing around in the bathroom by splashing and throwing water. Plaintiff told Sample to not splash water. (Pl. Dep. ECF 55-1 10:15-11:7). Plaintiff had no more incidents with Sample until the day Sample attacked Plaintiff. (*Id.* at 11:3-7). A couple days before June 14, 2015, Plaintiff asked to be moved to the other side of the dorm away from Sample and the young guys on Plaintiff's side of the dorm– who were several bunks away from Plaintiff–because Plaintiff couldn't get any sleep on that side of the dorm. (Pl. Dep. ECF 55-1 11:10-22, 13:22-14:7).

4

On June 14, 2015, Defendant Gatewood worked his 7:00 a.m. to 3:00 p.m. shift. (Kinney Dep. ECF 63-2 53:17-20; ECF 63-3). Correctional officers are expected to remain on the shift where they are assigned until the end of their shift or until relieved. (Kinney Dep. ECF 63-2 55:1-11). The first shift officers are usually relieved between 2:45 and 3:00 P.M. (Kinney Dep. ECF 63-2 69:1-3). Officer Nicholas Slagle ("Slagle") worked the 3-11 P.M. shift. (Kinney Dep. ECF 63-2 28:4-7).

Before lunch around 10 A.M. on June 14, 2015, Sample said something to Plaintiff (Plaintiff cannot recall what Sample said) and Plaintiff brushed it off, "walked it off," and went to ask Defendant Gatewood to please move Plaintiff. (Pl. Dep. ECF 55-1 11:10-22, 13:11-24).

Defendant Gatewood said he wasn't going to move Plaintiff. (Pl. Dep. ECF 55-1 11:21-22). Defendant Gatewood was aware of previous disciplinary issues with Sample, such as being insolent, being mouthy, and cussing at officers (Gatewood Dep. ECF 55-2 28:9-15) but Defendant Gatewood had not heard about violent attacks by Sample prior to Sample's attack on Plaintiff. (*Id.* at 23:24-24:4).

5

After lunch Plaintiff returned to the dorm around noon (Pl. Dep. ECF 55-1 17:22-23), approached Defendant Gatewood again and asked to be moved from that side of the dorm to get Plaintiff "away from these guys." (*Id.* at 16:6-9). Plaintiff asked to be moved and Defendant Gatewood said he was not a lieutenant. (*Id.* at 16:6-16). An inmate has to talk to the officer and then the officer has to talk to the lieutenant to be moved. (*Id.* at16:14-16, 20-24).  Plaintiff asked if Defendant Gatewood spoke to the lieutenant and Defendant Gatewood said he did. (*Id.* at 17:1-3). After speaking to Defendant Gatewood, Plaintiff returned to his bunk. (*Id.* at 17:17-18). Plaintiff then spent a couple hours around his bunk with other inmates (*Id.* at 17:21–18:6).

At some point after lunch, Sample came around Plaintiff's bunk area and began to "horseplay" with another young guy. (*Id.* at 19:3-17). Plaintiff told them to "please get out of my area," because they were falling all over the bunks and getting in Plaintiff's area. (*Id.*). Plaintiff left and used the bathroom and came back to find Sample and the young guy "tussling" and that they had moved the bunks out of the way. (*Id.*). Plaintiff told them to get out of his area and Sample "mouth[ed] off." (*Id.*). Sample seemed upset that Plaintiff was asking

him to stop. (*Id.* at 19:21-23). Plaintiff cannot recall if Sample threatened Plaintiff, nor does Plaintiff recall what Sample said, but Plaintiff brushed it off and went and told Defendant Gatewood again. (*Id.* at 20:4-7).

That day, Plaintiff spoke to Defendant Gatewood five times about Sample. (*Id.* at 91:14). Plaintiff asked Defendant Gatewood, to move him from the side with the young guys, because they were a "bunch of young kids" and they engaged in "horseplay," and were "playing too much." (*Id.* at 91:17-24). "They [were] wrestling, throwing water all on people's bunks." (*Id.*). Plaintiff "was trying to get moved before any of [that] occurred to [him]." (*Id.*). Plaintiff was trying to get off that side of the dorm. (*Id.* at 91:24-92:1).

Xavier Brownlee ("Brownlee"), a fellow inmate, witnessed Plaintiff asking to be moved several times. (*Id.* at 78:9-11). Brownlee witnessed one of the interactions that day between Plaintiff and Sample. (Brownlee Aff. ECF 63-4). Afterwards, Brownlee witnessed Plaintiff tell Defendant Gatewood that "[Plaintiff] was concerned for his physical safety after the altercation with [Sample.]" (*Id.*).

When Plaintiff came back, Sample said something else to Plaintiff and Plaintiff "brushed it off," and was not paying attention

7

to Sample. (Pl. Dep. ECF 55-1 19:15-17). Plaintiff was not afraid of Sample. (*Id.* at 20:11-18). Plaintiff did not expect Sample to hit him. (*Id.* at 20:13-14). Sample did not say anything to Plaintiff that made Plaintiff think that Sample was going to attack him. (*Id.*). "If [Sample] did, [...] this wouldn't have happened." (*Id.* at 20:15-18). Plaintiff "didn't see it coming." (*Id.* at 20:15-18).

Sample hit Plaintiff one time in the left eye with a key Sample held between his fingers. (*Id.* at 20:21-21:4). When Sample pulled his arm back, he pulled Plaintiff's left eye out of its socket. (*Id.*). Plaintiff fell and hit the bunk; Plaintiff couldn't see anything and couldn't do anything else. (*Id.* at 21:6-7). Plaintiff's fellow inmates told Plaintiff that Plaintiff was stabbed in the eye and bleeding and then the inmates summoned an officer. (*Id.* at 21:13-16). It took about five or ten minutes for the officer on duty to respond to Plaintiff's injuries and then call the shift commander. (*Id.* at 22:1-10). The officer "hurried up" and Plaintiff was "rushed" to the medical unit. (*Id.* at 24:7-10; 22:24-23:1). Slagle's incident report stated that Slagle saw Plaintiff at approximately 3:05 P.M. and sent Plaintiff to the healthcare unit. (ECF 63-1).

Defendant Gatewood saw Plaintiff holding his face and going to the healthcare unit between 3:20-3:30 P.M. (Gatewood Dep. ECF 55-2 22:14-24, 41:9-24). Defendant Gatewood then completed an incident report on June 14, 2015, at approximately 4:50 P.M., noting that he performed the last dorm check at 2:30 P.M. and that he observed Plaintiff to be uninjured. (Incident Report ECF 55-4). Defendant Gatewood did not see any odd behavior the day of the attack that would have raised a red flag that something was wrong. (Gatewood Dep. ECF 55-2 39:20-23). Defendant Gatewood did not see Sample and Plaintiff interact that day (ECF 55-2 13:17).

At approximately 4:16 P.M. on June 14, 2015, Plaintiff left Vandalia C.C. for medical treatment at a hospital. (ECF 55-7). While Plaintiff was being treated at a hospital, Plaintiff told a medical provider that he was stabbed in the eye around 1:30 P.M. (ECF 60).

Plaintiff was transferred from Vandalia C.C. to Western Illinois Correctional Center ("Western C.C.") on July 15, 2015. (ECF 55-7). Plaintiff was in the healthcare unit for two weeks after the transfer. (Pl. Dep. ECF 55-1 30:18-21). On July 21, 2015, Plaintiff agreed to enucleation (removing an eye) on his left eye and the surgery was completed on September 3, 2015. (Report of Dr. Veena Raiji ECF 55-

9

3 at 4-5). After the surgery, Plaintiff stayed in the healthcare unit for a week before he was sent back to general population. (Pl. Dep. ECF 55-1 33:2-8).

In general population at Western C.C., Plaintiff was housed in Unit 4, located in the back of the institution. (*Id.* at 34:2-8). The "chow hall," healthcare unit, commissary, and visiting room were next to each other at Western C.C. (*Id.* at 43:16-44:1). Plaintiff had to go the chow hall more than once a day, the healthcare unit once a day to get medication and have his bandages changed before lunch, and then go to the chow hall. (*Id.* at 33:17-19; 38:24-39:2; 39:20-23). Plaintiff received medication three times a day and his morning and evening doses were brought to Plaintiff's cell. (*Id.* at 34:15-35:18). Plaintiff would go to the commissary weekly. (*Id.* at 44:2-3).

Because of his missing eye, Plaintiff was given an eye patch for his eye, a slow walk permit, (*Id.* at 40:11-15) and a lower bunk permit to be in a lower bunk (*Id.* at 31:5-18). Plaintiff did not have any problems physically walking; the problems that he had were due to his eye problems. (*Id.* at 42:1-3). Plaintiff's eye injury affected Plaintiff's balance. (*Id.* at 92:19-21). His vision was blurrier, and he now wears glasses. (*Id.* at 50:19-24).

10

It would take Plaintiff 30-40 minutes to walk from his cell to the healthcare unit because the line of inmates had to repeatedly stop and wait for other housing groups to join the walking group, then keep going. (*Id.* at 34:12-14, 39:3-16, 41:14-24). Plaintiff was always in the back of the line because he walked slow and could not keep up. (*Id.* at 39:24-40:10). Sometimes other inmates assisted Plaintiff. (*Id.* at 40:3-4). Plaintiff never fell nor was injured while walking from his housing unit to any other place at Western C.C. (*Id.* at 42:19-23).

Plaintiff told a nurse, a doctor, someone in Internal Affairs and a counselor that it was too far to walk and asked if Plaintiff could be moved to Unit 1 to be next to the healthcare unit. (*Id.* at 45:7-18; 46:5-16; 50:6-8). Aside from asking to be moved closer to the healthcare unit, Plaintiff did not ask for any other arrangements related to his eye injury. (*Id.* at 59:5-9, 76:11-16).

Plaintiff was never denied the ability to go to the chow hall or health care unit. (Pl. Dep. ECF 55-1 42:24-43:3). Plaintiff was offered gym time, but Plaintiff did not go to the gym because the gym was too small and closed in. (*Id.* at 44:21-43:1). Plaintiff was able to go to the visiting room and the commissary at Western C.C. (*Id.* at 43:21-23). Plaintiff went to the yard a couple of times, but did not go to the

11

yard that often, even though the yard was just outside of his building. (*Id.* at 44:7-20). Inmates could have jobs at Western C.C., though Plaintiff never asked for a job and did not want a job. (*Id.* at 74:12-18). Plaintiff started classes at Western C.C. (*Id.* at 75:21-22). Western C.C. offered a drug program and Plaintiff was allowed in the program. (*Id.* at 74:19-75:3).

Plaintiff was moved to a housing unit closer to the healthcare unit shortly before he left Western C.C. (*Id.* at 45:19-24; ECF 55-7). Plaintiff was transferred from Western C.C. to another prison in May of 2016 and Plaintiff was released from IDOC custody in 2017. (ECF 55-7).

Plaintiff's eye expert, Dr. Veena Raiji ("Dr. Raiji"), evaluated Plaintiff's medical records, deposition, and grievances in an expert report (Report of Dr. Raiji ECF 55-3). Dr. Raiji evaluated Plaintiff's grievance of July 31, 2015, and opined that "[w]alking back and forth long distances to receive eye drops 5x/day is not reasonable, especially given [Plaintiff's] pain level and monocular status." (Report of Dr. Raiji, ECF 55-3 at 5).

## II.   ANALYSIS

### A. Defendant Gatewood

#### 1. Failure to Protect

State officials must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). For a state official to be held liable on a failure to protect claim, a plaintiff must satisfy a test that contains both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires the risk of harm to be "sufficiently serious." *Id.* The subjective component focuses on whether the official had a "sufficiently culpable state of mind." *Id.* For cases involving risk of harm to an inmate, a "deliberate indifference" standard is used. *Id.* Under this standard, a state official is liable only if he knows an inmate faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

Under "the subjective prong of the deliberate indifference claim," the "official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that

a substantial risk of serious harm exists, and he must also draw that inference.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Thus, in order to establish the liability of a prison official, a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (citation omitted). "[A] complaint that identifies a specific, credible, and imminent risk of serious harm *and* identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas*, 798 F.3d at 481 (emphasis added) (citation omitted). "Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas*, 798 F.3d at 480–81 (citations omitted). "Mere negligence . . . is not enough to state a claim of deliberate indifference[.]" *Pope*, 86 F.3d at 92 (citation omitted). "It is also not sufficient to show that the prison guard merely failed to act reasonably." *Id.* (citation omitted).

The Court agrees with Defendant Gatewood that no rational juror could conclude that Defendant Gatewood knew that Sample

posed a serious risk of substantial harm to Plaintiff before the attack. Plaintiff's requests to be moved away from the "young men" and Sample because of their horseplay were not enough to put Defendant Gatewood on notice that Sample posed a serious risk of substantial harm. *Cf.*, *Grieveson v. Anderson*, 538 F.3d 763, 776–77 (7th Cir. 2008) (holding that plaintiff's request to be moved to a "safer" block without informing prison officials about "a tangible threat to his safety or wellbeing" was too vague to put officials on notice of a specific threat to his safety). In his deposition, Plaintiff describes his interactions with Sample as consisting of exchanging "words" that Plaintiff "brushed off," or incidents where Sample splashed water in the bathroom, or Sample and other young guys played too much, engaged in "horseplay," threw water in people's bunks, and interfered with Plaintiff's sleep. Before Sample attacked Plaintiff, Sample and a young guy were "tussling" and fell over some bunks and moved bunks; Plaintiff told Sample to stop and Sample seemed upset and "mouthed off." These are not the kind of interactions that suggest violence was likely to occur between Plaintiff and Sample. *See Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005) (suggesting that substantial risk means "risks so great that they are almost certain to

15

materialize if nothing is done"); *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (concluding that an inmate who faced a threat of a possible but implausible prison riot failed to allege a substantial risk).

Plaintiff does not dispute that, before the attack, Defendant Gatewood was aware only of Sample's nonviolent disciplinary history. In addition, Plaintiff further testified in his deposition that Plaintiff was not afraid of Sample and did not expect that Sample would hit him. Sample did not say anything to Plaintiff that made Plaintiff think that Sample was going to attack Plaintiff. *See DeJesus v. Godinez*, 720 F. App'x 766, 771 (7th Cir. 2017) (holding that plaintiff's statement that another inmate was "aggressive" fell short of being a specific, credible, and imminent risk of serious harm, "especially since [the plaintiff] admit[ted] that even he had no idea [the other inmate] would attack").

Plaintiff offers Brownlee's affidavit which states that Brownlee witnessed "an altercation" between Plaintiff and Sample on June 14, 2015, but Brownlee does not say what the altercation was. (Brownlee Aff. ECF 63-4); *see Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) ("[C]onclusory statements, not grounded in specific

16

facts, are not sufficient to avoid summary judgment."). Brownlee also avers that he "witnessed [Plaintiff] tell [Defendant] Gatewood that [Plaintiff] was concerned for his physical safety after the altercation with [Sample]." (Brownlee Aff. ECF 63-4). Brownlee's affidavit is admissible, but Brownlee's statement about what Plaintiff said is inadmissible for the truth of the matter asserted—that Plaintiff was actually concerned for his physical safety or that such a concern would have been credible. Plaintiff himself was not afraid of Sample and did not expect to be attacked.  Brownlee's affidavit is too vague and conclusory to create a material dispute for trial. *See Grieveson v. Anderson*, 538 F.3d 763, 776–77 (7th Cir. 2008) (holding that plaintiff's request to be moved to a "safer" block without informing prison officials about "a tangible threat to his safety or wellbeing" was too vague to put officials on notice of a specific threat to his safety); *Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008) (holding that plaintiff's statements "that he was afraid for his life and he wanted to be transferred off the tier" lacked the specificity needed to alert officers to a specific threat and to hold them liable for deliberate indifference); *Simmons v. McCulloch*, 546 F. App'x 579, 582 (7th Cir. 2013) (holding that plaintiff failed to meet his burden where evidence

showed he "did not fear [his attacker], and he had never fought with him, or reported being threatened, or asked to be separated"; where plaintiff "admit[ted] in his deposition that the assault was unexpected, and in fact he was not even [the attacker's] initial target"); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (holding that defendants were not put on notice of a specific threat where plaintiff told officers only that he "was having problems in the block," "was scared," and "needed to be removed" and did not disclose what the specific threats were or identify who had threatened him.); *compare with Gevas v. McLaughlin*, 798 F.3d 475, 481–82 (7th Cir. 2015) (plaintiff adduced sufficient evidence of prison official's actual knowledge by testifying he informed defendants of the identity of the person who threatened him, the nature of the threat, and enough context to render the threats plausible).

Plaintiff offers Plaintiff's grievances filed after the attack and statements of other inmates (ECF 62), but the grievances and statements are inadmissible hearsay if offered for the truth of assertions therein. Fed. R. Evid. 801, 802. Mrs. Latrona Moore's affidavit about her phone conversations with Plaintiff is also inadmissible. (Latrona Moore Aff. ECF 63-5). Mrs. Moore does not

18

have independent personal knowledge of what occurred in prison. Fed. R. Civ. P. 56(c)(4). Further, the statements of these individuals, even if not hearsay, do not allow a plausible inference that Defendant Gatewood was aware before the attack that Sample posed a substantial risk of serious harm to Plaintiff.

In sum, no reasonable juror could find that Defendant Gatewood was aware of a specific and serious threat to Plaintiff from Sample. Accordingly, Defendant Gatewood is entitled to summary judgment on Count I.

### 2. Failure to Provide Medical Attention

Plaintiff did not allege that Defendant Gatewood failed to provide medical attention in Plaintiff's complaint. "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)).

In any event, this claim would not survive summary judgment. In his deposition, Plaintiff testified that after Plaintiff was attacked and injured, inmates went and got the correctional officer on duty, who came and notified the shift commander. Plaintiff estimated it

19

took 5-10 minutes. The unidentified officer who Plaintiff describes did not ignore Plaintiff's condition, but "'hurried up" so Plaintiff could be "rushed" to the medical unit.

Plaintiff offers a medical report where Plaintiff told medical staff that he was injured at 1:30 in the afternoon.  That statement cannot be offered to contradict Plaintiff's sworn testimony that Plaintiff was rushed to the medical unit.  In short, Plaintiff offers no evidence that Defendant Gatewood (or whoever was on duty at the time Plaintiff was injured) was deliberately indifferent to Plaintiff's medical needs after the attack.

### 3.  *Civil conspiracy*

With no federal claim against Defendant Gatewood, Plaintiff's civil conspiracy claim necessarily drops out as well. *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016)("[w]ithout a viable federal constitutional claim, [a] conspiracy claim under § 1983 necessarily fails; there is no independent cause of action for § 1983 conspiracy.").

### 4.  *Supplemental state law claims*

To the extent Plaintiff pursues supplemental state law claims against Defendant Gatewood, the Court declines to exercise supplemental jurisdiction over those claims.  28 U.S.C. §

1367(c)(3)(district courts may decline to exercise supplemental jurisdiction where court has dismissed all federal claims); <u>Williams Electronics Games, Inc. v. Garrity</u>, 479 F.3d 904, 907 (7th Cir.2007) (explaining the "presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims").

### B. *Defendants Western Illinois Correctional Center and IDOC*

Plaintiff alleges a violation of Title II of the ADA in that Plaintiff was discriminated against while he was at Western C.C. because he was denied services that would allow him to move from one building to another and obtain his medication without injuring himself. [ECF 6].  The only accommodation that Plaintiff sought was to be moved to a housing unit with a shorter walk to the healthcare unit and chow hall.

The Court agrees with Defendants that this claim fails because Plaintiff was not a qualified individual with a disability under the ADA.

To determine whether Plaintiff is a qualified individual with a disability, the Court inquires "[1] whether the plaintiff's condition constitutes an impairment under the ADA, [2] whether the activity upon which the plaintiff relies constitutes a major life activity, and [3] whether the impairment substantially limited the performance of the major life activity." *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005) (citing *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998)).

The parties agree that Plaintiff's missing left eye is an impairment under the ADA.  Walking is an enumerated major life activity under the ADA. 42 U.S.C. § 12102(2)(A) (stating major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing . . . .").

Plaintiff's ADA claim fails at the third element:  whether the loss of one eye substantially limited Plaintiff's ability to walk.  The Supreme Court has declined to hold that monocular individuals are disabled *per se*, but like anyone, must prove a disability "by offering evidence that the extent of the limitation in terms of their own

experience . . . is substantial." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999).

Plaintiff asserts that his problem walking was due to having no sight in his left eye which caused him to walk slowly. Plaintiff had issues with his balance and blurry vision. In his deposition, Plaintiff testified that it took him 30-40 minutes to walk from his housing unit to the back of the prison to the healthcare unit or chow hall in the slow walk line, and that he walked at the back of that group because he was so slow. Plaintiff had a slow walking permit, and never fell or was hurt while walking at Western C.C. Plaintiff does not say that he needed a cane or walking aid. While other inmates sometimes assisted Plaintiff, Plaintiff does not say how others assisted him or why he needed assistance.

A limitation on walking, restricted only to the 'rate and pace' instead of the actual ability to walk, is not a significant restriction when compared to the average person. *See Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 951 (7th Cir. 2000). In *Moore*, the Seventh Circuit Court affirmed the district court's determination that that a plaintiff suffering from arthritis was not substantially limited

in his ability to walk when he could walk up to one mile and his condition only affected the rate and pace of his activities. *Id.* at 951.

Plaintiff's expert, Dr. Raiji, opines that "[w]alking back and forth long distances to receive eye drops 5x/day [was] not reasonable, especially given [Plaintiff's] pain level and monocular status." This is not enough to allow a plausible inference that Plaintiff was substantially limited in his ability to walk to the prison healthcare unit or chow hall.  Dr. Raiji does not say what he considers a long distance or that he is familiar with how far Plaintiff had to walk. S*ee Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 522 (7th Cir. 2009) (stating that the plaintiff's testimony that they walk "'with difficulty,' without any medical corroboration or evidence as to time or distance limitations, was insufficient to survive summary judgment[.]")(quoting *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784–85 (7th Cir. 2007)).   Further, Dr. Raiji's description of the requirement as unreasonable is not the same as saying Plaintiff's ability to meet that requirement was substantially impaired.

"To qualify as disabling, a limitation on the ability to walk must be 'permanent or long term, and *considerable* compared to the walking most people do in their daily lives.'" *Fredricksen v. United*

24

*Parcel Serv., Co.*, 581 F.3d 516, 522 (7th Cir. 2009) (emphasis added) (quoting *EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 802 (7th Cir. 2005). No rational juror could conclude that the impairment to Plaintiff's ability to walk was sufficiently severe to rise to the level of a substantial limitation. *See, id.,* (plaintiff's walking-based disability did not qualify when the plaintiff was able to perform the essential functions of his job which included walking, standing, bending, stooping, climbing, and crawling for the duration of a workday); c*ompare with E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 793-94, 802 (7th Cir. 2005) (reasonable jury could find substantial limitation where plaintiff could not walk one block without her leg and feet going numb, walked with a cane, and had to balance against a wall to avoid falling). Accordingly, Defendants Western and IDOC are entitled to summary judgment.

**IT IS ORDERED:**

**(1)  The unidentified defendants ("Unknown Officers") are dismissed without prejudice for Plaintiff's failure to timely identify and serve them.**

**(2)  The motion for summary judgment by Defendants Gatewood, Western Illinois Correctional Center, and the Illinois**

Department of Corrections is granted on all of Plaintiff's federal claims. [55.]  The Court relinquishes supplemental jurisdiction over Plaintiff's state law claims.

(3)  The clerk is directed to enter judgment and close this case.

ENTERED: 4/25/2022


_____**s/Colin S. Bruce**_____
COLIN S. BRUCE
UNITED STATES DISTRICT JUDGE